STATE OF NORTH CAROLINA v. JAMES A. OVERMAN, JR., JAMES A. OVERMAN, SR., AND GAYNELL OVERMAN

No. 36

(Filed 12 December 1973)

1. **Criminal Law § 11— accessory after the fact to rape — knowledge that rape was committed required**

In a prosecution charging defendant mother and defendant father with the crime of accessory after the fact to the felony of rape com-

mitted by the defendant son, the trial court erred in denying the parents' motions for nonsuit where there was evidence that the parents had reason to believe that their son had become involved with his victim, that the victim had sustained an injury, that the son sought assistance to avoid detection and possible arrest for whatever had occurred, and that the parents gave him such assistance, but there was no evidence that the parents *knew* that their son had raped his victim. G.S. 14-7.

### 2. Rape § 5— sufficiency of evidence

The trial court in a rape case properly denied defendant's motion for nonsuit where the evidence tended to show that he took his victim to his trailer over her protest, that he there had sexual intercourse with her against her will, and that he and his parents subsequently abandoned her on a public highway.

### 3. Criminal Law § 99— incidents during trial — no expression of opinion by court

Actions of the trial court in a rape case did not amount to comments and opinions on the evidence and defendant was not prejudiced where (1) the trial court corroborated a witness's answer and sustained an objection which had not been interposed, (2) the court instructed defense counsel not to argue with the witness and announced his disagreement when defense counsel protested that he had not been arguing with the witness, and (3) the trial court instructed defense counsel not to interrupt the testimony of the prosecutrix.

### 4. Criminal Law §§ 75, 89— incriminating statements — no Miranda warnings — admissibility for impeachment

Statements made by defendants to a police officer during the initial phase of the investigation of the crime were properly admitted for the purpose of impeachment even though defendants had not been given sufficient *Miranda* warnings, since incriminating statements by a defendant obtained without compliance with *Miranda* may be used for impeachment when such defendant testifies in his own behalf.

APPEAL by defendants from *Bailey, J.,* 12 February 1973 Session of CHATHAM Superior Court.

Defendant James A. Overman, Jr. (Overman, Jr.) was indicted for the rape of Barbara Ann Sutton. Defendants James A. Overman (Overman, Sr.) and Gaynell Overman were indicted in separate bills for the crime of accessory after the fact to the rape of Miss Sutton by Overman, Jr.

Each defendant pleaded not guilty and the three cases were consolidated for trial.

In presenting its case, the State offered the testimony of Barbara Ann Sutton, the prosecutrix, of Donald Craig Thomas, and of Donald Whitt.

The following is a summary of MISS SUTTON'S testimony:

On the night of Saturday, 29 January 1972, Miss Sutton, age 26, went to the American Legion dance in West End. There she saw Overman, Jr., and danced with him. They left West End in his car about 9:30 p.m. It had been agreed that he was to take her to a dance in Southern Pines and thereafter take her to her home.

Overman, Jr., did not drive to Southern Pines. While traveling toward Siler City, he pulled off onto a dirt road, stopped, turned off the ignition, moved over toward Miss Sutton and started pulling off her blouse. She bit his finger, causing it to bleed, and he stopped his advances. He said he wanted to show her his trailer, but, upon her insistence, promised to take her home. Instead of taking her home (she lived with her mother between West End and Carthage) Overman, Jr., drove away from this area and, after traveling some distance on various roads, drove up a gravel road and stopped near the trailer in which Overman, Jr., lived.

Miss Sutton got out of the car and started running. Overman, Jr., chased and caught her. She pulled away and started toward a house which was near the trailer. She learned later that this house belonged to Overman, Sr., and Gaynell Overman, the parents of Overman, Jr. The chain around one of her boots became loose and hindered her running. When she took it off, Overman, Jr., grabbed it, struck her with it, and bruised her face. Despite her protests, Overman, Jr., said she was going into the trailer whether she wanted to or not. In their ensuing scuffle, Overman, Jr., knocked her backwards. She fell on her left leg and was unable to get up on it. Overman, Jr., picked her up and pulled her into the trailer.

Inside the trailer Miss Sutton took the boot off of her injured leg. Overman, Jr., promised to take her to the hospital after "he [had done] what he wanted to do." Thereupon, he undressed her, picked her up and laid her on the bed. She was crying and in pain. Over her protests, against her will, and despite her monthly menstrual period, Overman, Jr., had sexual intercourse with her. He then got up, put on his clothes and left the trailer.

Miss Sutton could hear that he was talking with someone outside the trailer. When he came back into the trailer, he told her to get dressed and then helped her to the door.

Upon leaving the trailer, Miss Sutton saw Overman, Sr., and a young boy in the front seat of the car in which she and Overman, Jr., had been riding. Overman, Jr., put Miss Sutton in the back seat and got in the back seat on the other side. Gaynell Overman got in the front seat with Overman, Sr., and the young boy. Miss Sutton told them she lived in West End and asked them to take her to the hospital. Overman, Sr., started the car and drove away from the trailer. It seemed to Miss Sutton that they were going in circles. Overman, Sr., and Gaynell Overman were whispering.

After they had been driving a half hour or more, Overman, Sr., stopped the car. Overman, Jr., and Gaynell Overman got out but, after a few minutes, got back into the car. Overman, Sr., drove a mile or so farther and stopped again. There Gaynell Overman told Miss Sutton: "[T]his is where you get out." When Miss Sutton asked why she was not being taken to the hospital, Gaynell Overman grabbed Miss Sutton's arm and pulled her out of the car. Miss Sutton was unable to stand up. The Overmans left, leaving Miss Sutton lying on a paved road, flat on the ground, where she stayed approximately fifteen minutes until Thomas, a motorist, saw her, stopped, placed her in his car, and took her to the Chatham Hospital.

Miss Sutton testified that at the hospital an x-ray was taken of her leg which showed that her leg was broken; that she was taken to a hospital at Chapel Hill where a cast was put on her leg; and that the cast remained there for six and one-half months.

At Chatham Hospital she related what had occurred to Deputy Sheriff Whitt of the Chatham County Sheriff's Department. Miss Sutton also testified that she had not been drinking on 29 January 1972.

DONALD CRAIG THOMAS testified that Miss Sutton was lying at the right side of the right-hand lane as he was driving home about 1:00 a.m. on 30 January 1972; that he stopped and was told by Miss Sutton that she couldn't get up and needed help; that she had one of her boots in her hand and was wearing her coat; that he picked her up completely off the ground, carried her to his car, and put her on the passenger's side of the front seat; that, in compliance with her request, he took her to the Chatham Hospital and waited there until officers came to ques-

State v. Overman

tion her; and that he "did not notice any odor of alcohol about her. . . . "

DEPUTY SHERIFF WHITT, of the Chatham County Sheriff's Department, testified that he saw Miss Sutton at the Chatham Hospital at approximately 1:45 a.m. on Sunday, 30 January 1972. Whitt related what Miss Sutton had told him on that occasion, this being substantially in accord with what she testified as a witness at trial.

Their motions for judgment as in case of nonsuit having been overruled, defendants offered evidence consisting of the testimony of each defendant and the testimony of character witnesses.

A summary of the testimony of OVERMAN, JR., is narrated below.

He had been drinking when he arrived at the American Legion dance in West End about 8:30 p.m. He saw Miss Sutton there about 9:00 p.m. He had never danced with her before, but on this occasion they "started dancing and drinking a little bit." He described his trailer to her. She said "it sounded like it would be a groovy place" and suggested that they "ride up there." They left the American Legion dance and, without stopping, drove to the trailer. En route, they were "drinking and talking."

Upon entering the trailer they first played records. Miss Sutton went back to the bedroom. She returned to the living room, took off her clothes, and said, "come on in here." He noticed that she was having her monthly period and said, "No, if you are ready to go I will carry you back home." Thereupon she got mad, furious, started hitting and slapping him beside the head and in the stomach, and he "smacked her back." Then Miss Sutton said, "Are you going to carry me home?" Overman, Jr., replied that he was "too drunk to drive." He left the trailer to ask his mother and father to drive Miss Sutton home. He got in the car with Miss Sutton and his parents and they drove off. He "passed out about four miles from the trailer."

Overman, Jr., testified that "Miss Sutton drank a right smart wine and beer"; that he "did not see a chain on her boot and [he] did not hit her with it"; that he "didn't hit her and break her leg"; that "[s]he was perfectly all right in the auto-

mobile"; and that he "did not have sexual relations with Barbara Ann Sutton."

A summary of the testimony of GAYNELL OVERMAN is narrated below.

She, her husband, two children, and her mother-in-law, were at home on the night of 29 January 1972. When they heard Overman, Jr., call, she and her husband went out to see what he wanted. Overman, Jr., said he wanted his father to drive a woman to her home. She saw Miss Sutton walk from the trailer. She had never seen her before and didn't know her name. She was not limping. She got into the back seat of the car without help. Overman, Sr., was driving. She and her "little baby boy" were sitting on the passenger's side of the front seat. Miss Sutton and Overman, Jr., were in the back seat. Miss Sutton was directly behind her (Gaynell Overman). She could smell "whiskey and beer" on Miss Sutton.

Soon Overman, Jr., went to sleep. Miss Sutton said she would direct them where to go and when to stop. Later, she said she didn't want to go home. She called on them to stop and let her out at a green house where "a real bright yard light" was burning.

Overman, Sr., stopped the car as directed. Gaynell Overman raised the seat. Miss Sutton got out and "started walking down the hard surface" of the highway.

Overman, Sr., turned around and drove back home. They had left the area of the Overman home and trailer "around ten to eleven o'clock." When they got back, Overman, Jr., was so drunk that they "put him in bed" at their house.

There was no bruise on Miss Sutton's face. She said nothing about going to the hospital.

On Sunday, 30 January 1972, about 5:00 a.m., officers came to the Overman house and questioned them about "this girl." On Wednesday, 2 February 1972, officers brought Miss Sutton and her mother to the house. The Overmans were told to come to Siler City the following day for further questioning.

The testimony of Overman, Sr., was in substantial accord with that of Gaynell Overman.

After defendants had presented their evidence, Thomas and Whitt were recalled and testified in rebuttal.

In rebuttal, Thomas testified that he looked around at the place where he found Miss Sutton but observed no house and no light in the vicinity.

The rebuttal testimony of Whitt will be set forth in the opinion.

The jury found the defendant Overman, Jr., guilty of rape as charged and judgment imposing a sentence of life imprisonment was pronounced.

The jury found defendants Overman, Sr., and Gaynell Overman guilty of accessory after the fact of the felony of rape. As to each, a judgment imposing a prison sentence was pronounced.

Overman, Jr., appealed to the Supreme Court as a matter of right. We allowed the motions of Overman, Sr., and Gaynell Overman that their appeals be heard in the Supreme Court without prior determination in the Court of Appeals.

*Attorney General Robert Morgan and Associate Attorney E. Thomas Maddox, Jr. for the State.*

*H. F. Seawell, Jr. for defendant appellants.*

BOBBITT, Chief Justice.

Defendants set forth eighteen assignments of error and filed a joint brief. Assignments Nos. 4 and 5 are directed to the denial of defendants' motions to dismiss as in case of nonsuit.

[1] We consider first whether the court erred in denying the motions of Overman, Sr., and Gaynell Overman. Each of these defendants was charged with the crime of accessory after the fact of the felony of rape as set forth in our preliminary statement.

G.S. 14-7 in part provides: "If any person shall become an accessory after the fact to any felony, whether the same be a felony at common law or by virtue of any statute made, or to be made, such person shall be guilty of a felony. . . . " An accessory after the fact under G.S. 14-7 "is one who, *knowing* that a felony has been committed by another, receives, relieves, comforts, or assists such other, the felon, or in any manner aids him to escape arrest or punishment." (Our italics.) *State v. Potter,* 221 N.C. 153, 156, 19 S.E. 2d 257, 259 (1942). *Accord,* 21 Am.

Jur. 2d, Criminal Law § 126 (1965); 22 C.J.S., Criminal Law § 96 (1961); Clark & Marshall, A Treatise on the Law of Crimes § 8.06 (7th ed. 1967); 1 Wharton's Criminal Law §§ 281-82, pp. 368-72 (12th ed. 1932).

To convict Overman, Sr., and Gaynell Overman, the State had the burden of proving beyond a reasonable doubt these essentials of the offense charged, namely: (1) That Overman, Jr., had actually committed the alleged crime of rape; (2) that the accused *knew* that Overman, Jr., had committed the alleged crime of rape; and (3) that the accused assisted Overman, Jr., in his efforts to avoid detection, arrest and punishment. *State v. Williams,* 229 N.C. 348, 49 S.E. 2d 617 (1948); *State v. McIntosh,* 260 N.C. 749, 753, 133 S.E. 2d 652, 655 (1963).

There was evidence to support findings that Overman, Sr., and Gaynell Overman had reason to believe that Overman, Jr., had become involved with Miss Sutton; that she had sustained an injury; and that Overman, Jr., sought assistance to avoid detection and possible arrest for whatever had occurred. Too, there was evidence that they removed Miss Sutton from the vicinity of their home, put her out of their car on a public highway and abandoned her, and later made false statements to investigating officers as to what had occurred. Moreover, there was evidence sufficient to support findings that Overman, Jr., had in fact committed the alleged felony of rape. Even so, we find no evidence that Overman, Sr., or Gaynell Overman *knew* that Overman, Jr., had raped Miss Sutton. Evidence (1) that Overman, Jr., left Miss Sutton in the trailer and sought the assistance of his parents; (2) that Miss Sutton heard Overman, Jr., talking with someone outside while she remained inside the trailer; and (3) that Overman, Sr., and Gaynell Overman conversed in undistinguishable whispers when Miss Sutton was riding with them, is insufficient to support a finding that Overman, Sr., and Gaynell Overman knew that Overman, Jr., had raped Miss Sutton.

There is no evidence that either Overman, Sr., or Gaynell Overman were present at the time of the alleged rape. Nor was there any evidence that anything was said in their presence to the effect that such rape had occurred. Although Miss Sutton testified that she complained to them of her injured leg and asked to be taken to the hospital, she did not testify that she made any complaint to either of them that she had been raped.

We note that Thomas testified that "[d]uring the period of time [he] was with Miss Sutton she did not mention anything about being raped."

According to Miss Sutton's testimony, the conduct of Overman, Sr., and Gaynell Overman was ruthless and inhumane. Whether such conduct would support a prosecution for a different crime is not before us. We simply hold that the evidence was not sufficient to support their conviction as accessories after the fact to the felony of rape as charged. Their motions to dismiss as in case of nonsuit should have been granted. The convictions of Overman, Sr., and Gaynell Overman must be and are reversed.

[2] Consideration of the evidence in the light most favorable to the State impels the conclusion that the motion of Overman, Jr., to dismiss as in case of nonsuit was properly overruled. Miss Sutton's testimony was sufficient to establish all essential elements of the alleged crime of rape. The credibility of her testimony was for jury determination.

There remains for consideration whether any of the other assignments disclose error prejudicial to Overman, Jr., and entitle him to a new trial.

Assignments Nos. 13, 14, 15, 16 and 17 are directed to designated portions of the court's instructions to the jury. None discloses prejudicial error. We note that Assignment No. 14 relates solely to Overman, Sr., and Gaynell Overman.

[3] In Assignment No. 2 defendants assert that "[t]he actions of the court as set out in Exceptions Nos. 2, 3 and 4 were comments and opinions on the evidence and were highly prejudicial to the defendants." The incidents to which these exceptions relate occurred during the cross-examination of Miss Sutton by defense counsel.

With reference to the incident referred to in Exception No. 2, the record shows that Miss Sutton testified on direct examination that she "hadn't known the defendant personally" before the night of Saturday, 29 January 1972, "but [she] had seen him quite a bit at dances." Early in the cross-examination of Miss Sutton, the following occurred:

"Q. Now, you say you had never seen this man before?

"A. No, sir.

"COURT: That isn't what she said.

"OBJECTION SUSTAINED."

After Miss Sutton had answered that she *had not said* that she had never seen defendant before 29 January 1972, the court corroborated her answer by a statement to that effect and sustained an objection which, so far as the record shows, had not been interposed by the State.

It does not appear that the court's action and comment were prejudicial to Overman, Jr. When the cross-examination proceeded, Miss Sutton testified that she had not had any dates with Overman, Jr., before the night of 29 January 1972; and that, although she did not know "where he lived, his age, statistics, so to speak," she had "danced with him quite a bit when there at different times."

With reference to the incident involved in Assignment No. 3, the record shows that Miss Sutton testified on direct examination that she became personally acquainted with defendant at the American Legion dance at West End; that he asked and was granted permission to take her home; and that they decided they would first go to a dance at Southern Pines. On cross-examination, Miss Sutton had testified that she had danced with defendant "quite a bit" at West End and that she "decided to leave the dance because it was a good idea to go someplace else." Then the following occurred:

"Q. You just decided it would be a good idea to go someplace else?

"A. Is there anything wrong with that?

"Q. Don't argue with me please, just answer my questions.

"COURT: Don't argue with the witness either, Mr. Seawell.

"MR. SEAWELL: I am not.

"COURT: I disagree."

The quoted question of the cross-examiner had just been answered by Miss Sutton. The solicitor might well have objected to the question on the ground that it invited needless repetition. Absent such objection, Miss Sutton, instead of repeating what she had just said, asked the quoted question.

Miss Sutton's response was not an answer to Mr. Seawell's question. Under these circumstances, the court enjoined Mr.

Seawell not to argue with the witness and announced his disagreement when Mr. Seawell protested that he had not been arguing with the witness. Although the cross-examination of Miss Sutton at this point is lacking in clarity and finesse, the record before us does not support the view that Mr. Seawell was engaging in an argument with Miss Sutton. When considered in its entirety, the impression prevails that the entire incident was much ado about very little.

With reference to the incident to which Exception No. 4 relates, Miss Sutton testified: "He picked me up and carried me into the trailer. I hollered several times when he was choking on me and when he knocked me down. He even said that he cut a girl's throat one time. He said he had hurt many people before. That is what he said. My leg was broken and I was in very much pain and he said he would hurt me even worse if I didn't cooperate. I laid [sic] perfectly still. I told him to leave me alone." Then the following occurred:

"Q. Just spoke to him?

"COURT: Let her finish her answer one time, Mr. Seawell.

"Q. Go ahead."

The record does not show whether Mr. Seawell had interrupted Miss Sutton on any prior occasion. Seemingly, Miss Sutton had not finished her answer on this particular occasion for the reason that her testimony resumes as if there had been no interruption after Mr. Seawell said "[g]o ahead." Suffice to say, the record is insufficient to show that Overman, Jr., was prejudiced by this incident.

[4] In Assignment No. 12, defendants assert that the court erred "in not conducting a proper voir dire, conducting a voir dire partially in the presence of the jury and not making proper findings of fact." Exceptions Nos. 23 and 24, on which this assignment is based, were noted in the record as indicated below.

Whitt's testimony during the State's presentation of its evidence in chief consisted solely of what Miss Sutton told him when he talked with her at the hospital in Siler City about 1:45 a.m. on Sunday, 30 January 1972. This testimony was offered and admitted only as corroborative evidence. At the conclusion of defendants' evidence Whitt was recalled and testified as to

what occurred when he and Deputy Sheriff Elkins went to the home of Overman, Sr., and Gaynell Overman during the morning hours of 30 January 1972.

Whitt was asked, "Did you question him [Overman, Jr.] about Miss Sutton, the lady who is the prosecuting witness in the case?" Exception No. 23 is addressed to the overruling by the court of defendants' objection to this question. Whitt answered, "Yes, sir." Whitt was then asked, "What did he tell you?" Defendants' counsel objected and said, "Qualify the witness." Thereupon, in the presence of the jury, Whitt testified that he advised Overman, Jr., with particularity of his constitutional rights as defined in *Miranda* and that he did so when all three defendants were together in a small room.

Whitt then testified, without further objection, that Overman, Jr., told him the following: "That he went to the dance at West End, that he got sick at the dance and came home early. That he came in and went to bed about eleven o'clock after his mother had got up and made him a sandwich and he drank a glass of milk and taken some aspirins and went to bed . . . he stated that he did not know Barbara Ann Sutton."

Whitt also testified that Mrs. Overman stated "that she fixed [Overman, Jr.] something to eat and he come in early that night and went on to bed, [and] they didn't know anything about any woman coming to the trailer or seeing any woman that night. . . ."

Whitt having stated that Overman, Sr., went outside with him and with Elkins, defendants' counsel objected "to anything said by Mr. James Overman, Sr." When Whitt testified that Overman, Sr., had made *a* statement, he was asked whether Overman, Sr., had been first advised of his constitutional rights under *Miranda*. He answered: "No, sir, at the time—other than at the time we were talking to the three of them, I advised him of his rights and I more or less at that time was talking to Mr. Overman, Jr."

Upon further objections by defendants' counsel, the jurors were excused and in their absence Whitt testified in substance as follows: That he did not specifically advise Overman, Sr., of his rights under *Miranda;* that Overman, Sr., was not at that time under investigation for any crime. In overruling defendants' objections to testimony as to any statement made by Overman, Sr., the court made these findings: "[T]he court finds at

the time of any statement made by Mr. and Mrs. Overman, on January 30th, that they had heard the rights as given to their son and knew that they were entitled to the same rights, but the investigation had not focused on them at that time. Statement made by them and their son was freely and voluntarily and understandingly made." Immediately following the quoted findings, the following appears: "Defendants Overman, Jr., Overman, Sr., and Gaynell Overman except. Exception No. 24."

Whitt then testified in the presence of the jury as follows: "I asked Mr. Overman, Sr., if that girl came to the trailer and if he knew anything about it. He said he did not. I advised him if he talked to us to tell the truth about it. He denied knowing anything about Miss Sutton. Mrs. Overman stated as Junior did, that when he came in sick she fixed him a sandwich and he drank a glass of milk and took some aspirins and went to bed. I asked her about a lady being in the trailer and she said she didn't see her." In response to a question on recross-examination Whitt testified: "All this took place before the warrant was sworn out."

We note that Mrs. Overman testified that officers brought Miss Sutton and her mother to the Overman house on Wednesday, 2 February 1972, and on that occasion Miss Sutton spoke to the officers but not to the Overmans. The officers then notified the Overmans to be present in Siler City on Thursday, 3 February 1972.

Whitt's testimony in rebuttal related to what defendants told him on 30 January 1972 during the initial phase of the investigation. The record shows that warrants for the arrest of defendants were not issued until 2 February 1972. The evidence tends to show that the warrants were served and defendants were arrested in Siler City on Thursday, 3 February 1972. There was no in-custody interrogation of any kind.

Whitt's testimony in rebuttal was offered solely to impeach the testimony of Overman, Jr., Overman, Sr., and Gaynell Overman. Even in-custody incriminating statements by a defendant obtained without compliance with *Miranda* may be used for impeachment when such defendant testifies in his own behalf. *Harris v. New York*, 401 U.S. 222, 28 L.Ed. 2d 1, 91 S.Ct. 643 (1971) ; *State v. Bryant*, 280 N.C. 551, 187 S.E. 2d 111, *cert. den.* 409 U.S. 995, 34 L.Ed. 2d 259, 93 S.Ct. 328 (1972).

The remaining assignments of error do not present questions of sufficient substance to justify discussion. Suffice to say, each has been considered and fails to disclose prejudicial error.

Having failed to show prejudicial error, the verdict and judgment as to Overman, Jr., will not be disturbed.

As to Overman, Sr., and Gaynell Overman: Reversed.

As to Overman, Jr.: No error.