STATE OF NORTH CAROLINA v. CRAIG McCRAY

No. 204A84

(Filed 8 January 1985)

**1. Homicide § 9— first-degree murder of prison inmate—response to taunting—no self-defense**

In a prosecution for first-degree murder, there was no evidence of self-defense where there was a great deal of animosity and tension between defendant, a prison inmate, and deceased, another inmate, which had been brought on by deceased's taunting and intimidating defendant; where defendant, after deceased pointed a finger and laughed at him, went to the back of his cell block to get a knife, went to a different cell block where neither inmate lived and stabbed deceased; and where defendant chased the fleeing decedent through a number of cell blocks, ignoring the shouts and whistles of the prison guards, cornered deceased at a stairway facing a locked door, and repeatedly stabbed deceased, switching hands and continuing when another inmate grabbed him.

**2. Homicide § 9.4— first-degree murder of one prison inmate by another —defense of home not appropriate**

The doctrine of defense of home did not apply where defendant, a prison inmate, responded to taunts from decedent, another inmate, by attacking decedent in a cell block in which neither lived, then chasing decedent through a number of cell blocks and corridors while decedent ran for his life.

**3. Homicide § 19.1— first-degree murder—evidence of deceased's violent character—properly excluded**

In a prosecution for first-degree murder where the State's and defendant's own evidence clearly indicated that defendant was the aggressor and initiated

the fatal assault, evidence of decedent's character and reputation as a violent and dangerous person was properly excluded.

**4. Homicide § 27.1 — first-degree murder—instruction on voluntary manslaughter—properly denied**

Defendant was not entitled to a jury instruction on the lesser included offense of manslaughter based on a sudden heat of passion triggered by terror where defendant, a prison inmate, responded to repeated taunts by another inmate by calculatedly retrieving a hidden knife, going to a different cell block and attacking the other inmate without warning, then chasing and cornering the other inmate, stabbing him a total of twenty times despite shouts and whistles from prison guards, pleas from the victim, and attempts to grab the knife, and stated after the attack that he meant to kill the deceased.

**5. Criminal Law § 86.2 — first-degree murder—cross-examination of defendant about prior criminal acts—no error**

In a prosecution for first-degree murder by a prison inmate using a knife, there was no error in allowing the district attorney to cross-examine defendant about specific acts committed by defendant which resulted in convictions for seven robberies, several of which involved a knife. A criminal defendant who takes the stand in his own behalf may be asked whether he has committed specific criminal acts.

**6. Criminal Law § 75.12 — first-degree murder—incriminating statement—no Miranda warning—admitted for impeachment**

In a prosecution for first-degree murder, there was no error in admitting defendant's statement that he meant to kill decedent where the statement was made without any *Miranda* warning and in response to an officer's question about what happened, where defendant's statement was introduced only on rebuttal after defendant denied that he meant to kill decedent and denied making the statement, and where the court conducted a *voir dire* hearing before admitting the evidence.

**7. Criminal Law §§ 85, 97.2 — first-degree murder—only one of five character witnesses allowed—no abuse of discretion**

There was no abuse of discretion where the court allowed defendant to present only one of five character witnesses; moreover, any possible error is harmless within the meaning of G.S. 15A-1443(a) or (b) given the overwhelming evidence that defendant sought out, attacked, chased, and killed decedent.

Justice VAUGHN did not participate in the consideration or decision of this case.

BEFORE *Brown, J.,* at the 12 December 1983 Criminal Session of Superior Court, HALIFAX County, defendant was convicted of first-degree murder. Pursuant to N.C.G.S. § 7A-27(a), he appeals from a judgment sentencing him to life imprisonment. Heard in the Supreme Court 10 September 1984.

Defendant was tried upon an indictment, proper in form, which alleged that he murdered Alphonso Revell on 19 December 1982. At that time defendant and Revell were both confined as inmates in the Caledonia Prison in Halifax County. On 15 December 1983, the jury found the defendant guilty of first-degree murder. Following a sentencing hearing conducted pursuant to N.C.G.S. § 15A-2000, the jury recommended that defendant be sentenced to life imprisonment. Judge Brown entered judgment sentencing defendant to life imprisonment; this sentence to commence at the expiration of the sentence for which the defendant was imprisoned when the killing occurred.

*Rufus L. Edmisten, Attorney General, by Assistant Attorney General Thomas F. Moffitt, for the State.*

*James S. Livermon, Jr., for the defendant-appellant.*

MEYER, Justice.

The defendant was charged with the murder of fellow prison inmate Alphonso Revell. At trial he admitted killing Revell but testified to the effect that he did so in self-defense. The majority of defendant's assignments of error are addressed to the trial court's rulings on the issue of self-defense. We find no reversible error and affirm the defendant's conviction and sentence.

I.

In its case-in-chief, the State presented the testimony of a number of prison employees and officials who witnessed various portions of the events just prior to Revell's death.

Gary Cook testified that he was employed by the North Carolina Department of Corrections at the Caledonia Prison Unit on 19 December 1982. At approximately 7:15 or 7:20 a.m., he had been on duty in Building Number One, where the intensive management and hospital wings are located. As he was on his way to Building Number Two, a dormitory building, Cook heard a guard's whistle summoning others for assistance.

Cook entered Building Number Two and ran down the corridor separating Cell Block "A" from Cell Block "B", until he reached a stairway approximately 45 feet away. Cook noticed blood on the hallway floor and wall in front of "B" Block. He

climbed the stairway to the second floor where "E" and "F" Blocks are located. Following the trail of blood, Cook eventually went around "F" Block and discovered inmate Alphonso Revell lying at the bottom of a stairway against a locked door. Defendant McCray was standing beside a Department of Corrections officer. McCray had a great deal of blood covering his body and a bloody homemade prison knife (known as a "shank"), approximately 8 to 10 inches long, in his hand.

Cook and another officer removed McCray from the scene and strip-searched him. Cook observed that McCray did not have any cuts, wounds, or other physical damage to his body, although he observed a large amount of blood on McCray.

On rebuttal after defendant had testified on his own behalf, Cook testified that while searching McCray, he asked McCray what happened. McCray responded, "I was tired of this man f---ing with me; I meant to kill him."

Two other prison guards testified to the effect that defendant had chased Revell through a sizeable portion of Building Two and continued to chase Revell and stab him with a "shank" despite efforts to stop him.

Orlando Lewis testified that he was on the second floor of Building Two near "E" and "F" Blocks at approximately 7:15 to 7:20 a.m. While he was conducting a routine search of the barber shop, he observed inmate Revell running away from McCray on the floor below. McCray was chasing Revell, and Revell's shirt had blood around his lower front abdomen and back. McCray had a "shank" in his right hand. Lewis ran behind them and yelled for McCray to stop. McCray looked back at Lewis and continued to chase Revell. At this point, Lewis began to blow his whistle continuously.

Lewis then went to unlock a door to allow other officers access to the area. By this time, McCray and Revell were at the stairway. McCray was behind Revell and had his left arm wrapped around Revell, holding onto him tightly. McCray continuously stabbed Revell with the "shank," which he held in his right hand. Lewis again yelled to McCray to stop. According to Lewis, Revell yelled "help" three times, each time his voice getting lower. McCray continued to stab Revell. After other prison

officers arrived and had McCray in custody, McCray turned and kicked Revell in the head as Revell lay at the base of the stairway.

Jeffrey C. Ritter testified that he was on duty in the dining hall of the first floor of Building Two on the morning in question. Ritter heard a whistle and ran to Door 353, which was locked. The door was located at the base of the stairway leading up to "E" and "F" Blocks (fifteen feet away). He saw McCray and Revell standing at the top of the stairway. McCray was holding Revell tightly with his left hand and was stabbing Revell with a homemade knife in his right hand. According to Ritter, Revell was yelling, "Stop stabbing me!" and "Help!" as he tried to pull away from McCray.

Ritter, who had been blowing his whistle the entire time, continued to watch as Revell and McCray started falling down the steps and landed on a flat area. There, Revell again tried to pull away from McCray, causing the two to fall further down the stairs. Ritter yelled at McCray to stop, but McCray did not respond. At the base of the steps, McCray straddled Revell and continued to stab him. Revell yelled, "Help! Stop!", very faintly as the stabbing proceeded. At this point, Ritter saw a hand grab McCray's right hand. McCray then shifted the knife to his left hand and lunged with the knife into Revell's chest. When McCray withdrew the blade, there was a gush of blood.

Another prison guard, Jasper Howard, testified that upon arriving at Door 353, he observed inmate Revell lying on his back in a pool of blood. Inmate Alonzo Willis was restraining McCray, who was still trying to get to Revell. In McCray's hand was a homemade prison knife. Other prison officers came down the stairway and shouted to McCray to drop the knife, which he did. Revell attempted to get up, but was unable to. Howard got a stretcher and helped to take Revell to the prison hospital. Howard did not see any weapons in the area, other than the knife wielded by McCray.

Grady Massey testified that he was a personal health assistant employed by the Department of Corrections at Caledonia Prison on December 19, 1982. At approximately 8:00 a.m., he visually examined Craig McCray to make sure that he was not physically injured in the affray. The visual examination revealed

no cuts, bleeding, or injuries of any kind. McCray told Massey that he was not injured.

Halifax County Deputy Sheriff Charles E. Ward testified that he observed the dead body of Alphonso Revell at approximately 10:30 a.m. on December 19, 1982. He observed at least 13 stab wounds on Revell's back, side, and chest.

The final State's witness was Dr. John Allen Wolfe. Wolfe testified, as an expert forensic pathologist, about the autopsy he performed on the body of Alphonso Revell in the office of the Chief Medical Examiner at Chapel Hill on December 20, 1982. During the autopsy, Dr. Wolfe observed a total of 20 stab wounds, eight of which passed into the body and penetrated vital body structures resulting in a large amount of bleeding into Revell's chest and abdomen. Ten of the stab wounds were to the back. There were four major wounds to Revell's right side, all of which resulted in severe injuries. There was one stab wound to the right upper chest. The wounds varied in depth, with the deepest wounds penetrating five and one-quarter inches. In Dr. Wolfe's opinion, Alphonso Revell died as the result of severe blood loss from the multiple stab wounds he received.

On cross-examination, Dr. Wolfe testified that Revell was 23 years old, six feet one and a half inches tall and weighed 172 pounds.

The defendant presented the testimony of two witnesses. On direct examination, defendant, Craig McCray, testified that he was 30 years old and had been in prison for a total of 12 years. At the time of the stabbing incident he was serving a sentence of 25 to 50 years imprisonment for seven counts of armed robbery. McCray testified that he did not know Alphonso Revell personally, but had seen him from time to time because they slept in the same dormitory.

The first actual contact that defendant had with Revell came in December 1982 and arose out of an incident concerning another inmate at Caledonia. That inmate had asked McCray to help protect him from Revell, defendant agreed to do so, and this agreement created animosity between Revell and the defendant. Shortly thereafter, Revell tried to provoke a fight with defendant and defendant "just played it on off" in an attempt to avoid a con-

frontation. According to McCray, within the prison community this behavior on his part was "the sign of weakness," which other inmates would be likely to take advantage of when the opportunity arose.

McCray testified further that Revell began to threaten him about what he was going to do. According to McCray, ". . . he [Revell] kept on making verbal statements about what he was going to do to me. . . . He would say that, I'm gonna get you—you know—I' gonna hound you too—you know—kept on making statements." McCray took Revell's statements as threats and concluded that at some point Revell would sneak up on him and hurt him. In the defendant's own words, the situation "kept on brewing and brewing." McCray testified that he went to Revell to talk to him but that Revell just looked at him and laughed. According to McCray, "He kept on making statements to other people about what he was going to do, then I'm saying if he don't stop, if he keeps on pushin' me, I'm going to have to do something sooner or later." In the days immediately preceding the killing, McCray and Revell eyed each other warily. McCray requested and received a transfer from "G" Block (where they both were housed) to "B" Block. However, Revell continued to harass McCray by watching him, by "circling" him, and by making inquiries about him in "B" Block. On the day before the stabbing, Revell, clasping a "shank" at his side, "circled" McCray and then walked away, stopped at a gate and pointed his finger at McCray. Later that day, Revell asked another inmate which bed McCray slept in and that inmate told him that McCray slept in the top bed. Revell then walked by and "circled" with his hand tucked in his coat pocket.

McCray testified that, "I knew he was trying to close in on me . . . I know I can't do nothing else but fight 'cause I ain't got nowhere else to go . . . I was afraid of the harm he could do to me. Yes, I was afraid of him." McCray rejected going to prison authorities because it would adversely affect his reputation among his prison peers and would make him vulnerable.

On the morning of the killing, Alphonso Revell came over to "B" Block, pointed to McCray, and started to laugh at him. Revell left and went to "A" Block to get a cup of coffee. McCray then testified that:

He [Revell] had went back and got a coffee from another inmate. He was drinking coffee. So he came in and when he saw me coming, he watched me. Then he went in and set the coffee down. So by this time I'm just up on him. So at this time he shuffling—he shuffling. He watching me. So at the time—

\* \* \*

So at this time I'm approaching so he start shuffling. So when I gets up to him I pulls out my shank. He looks at me. He do like—he flinched. I stabbed at him and hit him in the neck. He jumped between the beds, he reaching down, so I swung at him again and another inmate approached right there and he flinched so I backed up. I'm looking at him. He steady—Alphonso steady flinching so I'm steady looking at him like this right here, my hands like I got them now—you know—at the time everything happened so spontaneously, I'm jumpy. I stabbed him again and he ran out then jumped down through the beds and ran to the door. He ran to the door. He stopped and did like this and he looked at me—you know—and he started back coming towards me again—you know—so I started walking towards him and started running at him and he broke out and started running up the stairway and I kept chasing him, chasing him, chasing him until we go to the bottom of the stairs and I just snapped (snapped fingers). We was on the staircase. He ran under me. He ran up and under me tried to jack me up and I spreaded my legs and then I just kept stabbin him.

\* \* \*

So at this time when he ran back up to me and I spread my legs and started stabbing him, we fell down the steps. I fell on my back and tossed over—I turned him over. I stabbed him and he grabbed my arm. We steady struggling, steady struggling, and at the time another inmate from the shop grabbed my hand, and I was just—I wasn't there—you know—and when I became conscious of where I was at—you know—Alphonso was laying on the floor after I got up and then when I got up Alphonso tried to get back up and I still had the shank in my hand so other inmate stepped between us—you know—and the police was coming in—officers was

coming in so I dropped the shank on the floor. He reached to pick the shank up so I kicked him and then other inmate pushed me back and then the officers grabbed me by the shoulder and handcuffed me and took me in the back lobby and then from there—you know—to segregation.

McCray also testified that when he approached Revell in "A" Block, he assumed that Revell was ready to fight and that Revell was armed. McCray testified that he knew of Revell's character and reputation in the prison as a violent fighting man and stated that, "Every time I had seen the man he usually have a shank in his possession or a shank in the block or somewhere around." McCray said nothing to Revell as he advanced and explained that he attacked Revell because:

. . . 'cause I know sooner or later that he could hit me—he could stab me any time he get ready. He could do what he wanted to do 'cause I was trying to get away from him by not showing no sign that I would advance on him or try to straighten it out or do anything that just—when you show kindness to a person or weakness or anytime you humble yourself in any type of way. It could be in relenting, any type of humbleness is a sign of weakness. . . .

When specifically asked by defense counsel about threats that Alphonso Revell made to him McCray testified that:

He kept telling me, say, I ain't going to do nothing to you—you know—if I want to do something to you, I can get you any time I get ready—you know—this and that there —you know—I kept telling him, I say, Well, man, why you keep on telling other inmates you gonna do this and do that there—you know—he say, Don't even worry about it—you know—we goina handle this here—you know—then he would come back. After he keep leading on, he say—then he would say, What you want to do—you know—and I tell him—you know—like—hey, man—you know—like—it ain't got to be like this—you know—he come back with another statement—you know—like—he'd just come by sometime, he'd just shake his finger at me and laugh—you know—I'd shuck it on off—you know—or he'd tell some other inmate about what he was—.

The defendant concluded his direct examination testimony by saying that he was five feet seven inches tall and weighed 169 pounds. He was a weight lifter and had won several trophies when he was on the Central Prison AAU Weight Lifting Team.

On cross-examination, the defendant testified that after Alphonso Revell shook his finger at McCray and laughed at him from the hallway separating "A" and "B" Blocks, McCray went from the doorway of "B" Block to the sink at the back of "B" Block and got his knife. He walked from the back of "B" Block to the doorway (approximately 25 feet), crossed the hallway into "A" Block, walked to where Revell was standing in the back of "A" Block, and struck Revell in the neck with the knife.

Following the defendant's testimony, defense counsel attempted to present the testimony of five prison inmates, Byron J. Stevens, Keith Ward, Clinton Thomas, Charles C. Morrow and Joe Andrew. In essence, these witnesses were prepared to testify that Alphonso Revell had a bad reputation as a violent and dangerous fighting man and that McCray had a good reputation as a non-violent individual. In addition, Thomas, Morrow and Luther were prepared to testify that in the days immediately preceding 19 December 1982, they overheard the decedent, Alphonso Revell, make statements to his associates that he was going to attack or kill Craig McCray.

Prior to calling Stevens, Ward, Thomas, Morrow and Luther, the trial judge informed defense counsel, outside the presence of the jury, that he would sustain objections to any evidence the defendant intended to offer as to the character and reputation of the deceased as a violent and dangerous person because there was no evidence of self-defense arising from the evidence thus far presented. Additionally, the judge limited the number of character witnesses that defendant could present on his own behalf. However, the trial judge did allow preservation of their testimony for the record.

The only other witness that defendant was permitted to present to the jury was fellow inmate Charles C. Morrow. Morrow was called as a character witness and he testified that defendant McCray's character and reputation at the time of the killing at Caledonia Prison was good.

At the conclusion of the trial, the court refused to charge the jury on the issue of self-defense and refused to allow defense counsel to argue self-defense as a theory of defense to the jury in his closing argument.

## II.

The principal question presented by this appeal is whether the trial court erred in ruling that, as a matter of law, there was no evidence of self-defense arising from the testimony of the defendant. Based upon this ruling, the trial court prohibited the defendant from offering witnesses who were prepared to testify about the victim's reputation as a dangerous and violent man, refused to charge the jury on the issue of self-defense, and refused to allow defense counsel to argue self-defense as a theory of defense to the jury in his closing argument. The defendant assigned error to these rulings and the question of self-defense forms the primary basis of his appeal.

In his brief, the defendant concedes that the evidence reflects that on the morning of the killing, the defendant was the aggressor and precipitated the fatal encounter, thereby forfeiting his right of self-defense. However, defendant contends that these events should not be viewed in isolation. Defendant ardently argues that when the long-standing situation between the parties is taken into account, the evidence may be fairly read to demonstrate that the deceased was actually the aggressor and that the defendant was simply initiating an attack which would prevent the deceased from ultimately killing the defendant. According to the defendant, the fatal encounter was set in motion by the victim earlier in the month when the victim goaded and threatened the defendant. In addition, the defendant asserts that the evidence shows that he was entitled to the right of self-defense under the doctrine of home or habitat. We do not agree.

## A.

[1] The critical question presented is whether there was any evidence of self-defense presented in this case. In resolving this question the facts are to be interpreted in the light most favorable to the defendant. *State v. Watkins*, 283 N.C. 504, 196 S.E. 2d 750 (1973).

"A person may kill in self-defense if he be free from fault in bringing on the difficulty and it is necessary, or appears to him to be necessary to kill so as to save himself from death or great bodily harm." *State v. Davis,* 289 N.C. 500, 509, 223 S.E. 2d 296, 302, *death penalty vacated,* 429 U.S. 809 (1976). Accordingly, to be entitled to an instruction on self-defense a defendant must present evidence tending to show (1) he was free from fault in the matter, and (2) it was necessary, or reasonably appeared to be necessary, to kill in order to protect himself from death or great bodily harm. *State v. Spaulding,* 298 N.C. 149, 257 S.E. 2d 391 (1979).

The requirement that a defendant must be free from fault in bringing on the difficulty before he may have the benefit of self-defense ordinarily means that he himself must not have precipitated the fight by assaulting the decedent or by inciting in him the reaction which caused the homicide. *State v. Jennings,* 276 N.C. 157, 171 S.E. 2d 447 (1970).

"[T]he right of self-defense rests upon necessity, real or apparent; and, in the exercise of his lawful right of self-defense, a person may use such force as is necessary or apparently necessary to protect himself from death or great bodily harm. (Citation omitted.) In this connection, the full significance of the phrase 'apparently necessary' is that a person may kill even though to kill is not actually necessary to avoid death or great bodily harm, if he believes it to be necessary and has a reasonable ground for that belief. The reasonableness of his belief is to be determined by the jury from the facts and circumstances as they appeared to him at the time of the killing." *State v. Gladden,* 279 N.C. 566, 572, 184 S.E. 2d 249, 253 (1971).

Application of these principles to the facts in the case under discussion reveals that: (1) the defendant was not free from fault, and (2) there was no necessity—real or apparent—for the defendant to kill in order to protect himself from death or great bodily harm at the time in question. Defendant's evidence was to the effect that in the days preceding the fatal encounter a great deal of animosity and tension between the deceased and McCray was generated by the actions of the deceased in taunting and intimidating the defendant. Revell had repeatedly signaled the defendant, by "circling" and pointing to him, that he was after the defendant and might come and "get" defendant any time he was

ready to. Nevertheless, in the time immediately prior to the fatal attack, the defendant readily admitted that the deceased was simply standing and shuffling his feet when the defendant, without warning, attacked him — striking the first blow with a knife which cut the deceased's neck. We are not persuaded by defendant's argument that Revell should be considered the aggressor in the fatal affray by reason of his prior actions.

The evidence, when viewed in the light most favorable to the defendant, indicates that he was not without fault and voluntarily and aggressively initiated an armed attack upon the deceased on the morning of 19 December 1982. The evidence plainly shows that on the morning in question, Revell came to Cell Block "B" where the defendant lived, pointed his finger at the defendant and laughed at him. After this, Revell left and went across the hall to Cell Block "A", where neither the defendant nor Revell lived. The defendant then went to the sink at the back of Cell Block "B", got his "shank" which was hidden there, left his cell block and entered Cell Block "A" looking for Revell. He found Revell drinking coffee and without warning, defendant advanced and stabbed Revell in the neck. Although he assumed Revell was armed with a "shank," no weapon was found. When Revell attempted to flee, the defendant chased him through a number of cell blocks, ignoring the shouts and whistles of the prison guards and cornered Revell at a stairway facing a locked door. There, McCray repeatedly stabbed Revell, despite Revell's pleas. When another inmate attempted to grab defendant's right hand, defendant switched the knife to his left hand and continued stabbing Revell.

We hold that upon these facts no evidence of self-defense is presented as a matter of law. The most that can be said of the events preceding the fatal encounter is that they shed light on the motive for the killing. It appears that defendant sought out and attacked Revell in order to stop Revell from intimidating and ridiculing defendant for his perceived weakness in front of other inmates. By his words, Revell had let defendant know that he intended to keep taunting defendant, that he wasn't "going to do nothing" to defendant, but that *if* he wanted to, he could get defendant "any time I get ready." According to defendant, the situation was such that *he* was "going to have to do something sooner or later." Rather than take any more abuse, defendant

decided to act before Revell did something to hurt him. In defendant's own words, "I was tired of this man f---ing with me; I meant to kill him."

Where a defendant aggressively seeks out his victim and brings on the fatal attack by his own actions, he may not avail himself of the defense of self-defense. *State v. Watkins*, 283 N.C. 504, 196 S.E. 2d 750; *State v. Brooks*, 37 N.C. App. 206, 245 S.E. 2d 564 (1978). All of the evidence presented tended to show that the defendant was the aggressor in the fatal affray. No evidence was presented which indicated that an attack from Revell was either made or was imminent. Accordingly, defendant may not claim that he was without fault and that his attack upon Revell was "apparently necessary" *at the time of the killing.*

[2] Nor are we persuaded by defendant's argument that his evidence should be considered in light of the legal doctrine of "defense of home." The defendant asserts that he had no duty to retreat in the face of Revell's intimidation and could "stand his ground, repel force with force so as to overcome the assault of another while the defendant was in his home. . . ." The defendant contends that the entire Caledonia Prison is to be considered his "home" for purposes of his argument that he had no necessity to retreat from Revell. According to the defendant, his "home and his curtilage" included "the prison, its cells, its dorms, its building and its surroundings within the guarded fences."

Ordinarily, when a person who is free from fault in bringing on a difficulty is attacked in his own home or on his own premises, the law imposes on him no duty to retreat before he can justify his fighting in self-defense. The person is entitled to stand his ground, to repel force with force, and to increase his force to overcome the assault and to secure himself from harm. *State v. Johnson*, 261 N.C. 727, 136 S.E. 2d 84 (1964). The evidence in the case under discussion does not warrant application of this rule because: (1) the defendant was not free from fault because he was the aggressor, (2) the defendant was not physically attacked by the victim, and (3) the defendant was not defending his habitation.

By his own testimony, the defendant was housed in Cell Block "B." Revell came to Cell Block "B" that morning, but left after taunting and laughing at the defendant. Revell went to Cell Block "A"—where neither man lived—to get some coffee. The

defendant got his "shank," left his cell block, found Revell in Cell Block "A", approached and stabbed him in the neck without warning. Clearly, the defendant never had to retreat because he was the attacker. Rather, the facts show that defendant chased Revell through a number of cell blocks and corridors while Revell ran for his life. Furthermore, the entire Caledonia Prison simply may not be considered as the defendant's "home" for purposes of the self-defense and defense of one's habitation doctrines. The "defense of one's habitation" rule has absolutely no application in this case. Accordingly, the trial judge correctly concluded that no evidence of self-defense was presented by the defendant as a matter of law.

### B.

[3] In cases where an issue of self-defense is properly raised, evidence of a homicide victim's violent character is admissible to show the defendant's reasonable apprehension of death or bodily harm, if the defendant was aware of the decedent's reputation as a violent and dangerous fighting man. *State v. Winfrey*, 298 N.C. 260, 258 S.E. 2d 346 (1979). It is also admissible to shed light upon who the aggressor was. *Id.* Consequently, where, as in this case, the State's and the defendant's own evidence clearly indicates that the defendant was the aggressor and initiated the fatal assault, no issue of self-defense arises and the trial judge may properly exclude evidence of the decedent's character and reputation as a violent and dangerous person because it is not relevant to the issues presented. Therefore, the defendant's assignment of error with regard to this ruling is without merit.

### C.

Defendant raises several issues by his final assignment of error relating to the question of self-defense. First, he argues that the trial judge erred by not charging the jury on the issues of self-defense and defense of one's home and by not allowing defense counsel to argue these theories to the jury. Next, the defendant asserts that the trial judge erred by not allowing him to argue that he killed Revell in the sudden heat of the passion of terror. According to the defendant, his "terror" robbed the crime of malice thereby requiring the trial judge to submit the lesser included crime of voluntary manslaughter to the jury.

[4] For the reasons set forth in Part II, A & B of this opinion, we hold that this assignment of error is without merit as to the

doctrines of self-defense and defense of one's habitat. In his second argument, defendant cites *State v. Jennings*, 276 N.C. 157, 171 S.E. 2d 447, for the proposition that "terror" can trigger a "sudden heat of passion" which can reduce a homicide from murder to manslaughter. While this may be true as an abstract proposition, in this case the facts in evidence clearly refute the assertion that the defendant acted under the "sudden heat of passion" of terror.

The evidence reveals that defendant was annoyed and antagonized by Revell's actions. In the defendant's own words, the situation "kept on brewing" and if Revell did not stop taunting him, he was "going to have to do something sooner or later." After the most recent episode, the defendant calculatedly retrieved his knife from its hiding place in Cell Block "B" and went to Cell Block "A" where he attacked Revell without warning. Defendant continued to chase Revell and eventually cornered him at a stairway blocked by a locked door. Despite shouts and whistles from the prison guards, the pleas of his victim, and attempts to grab the knife from his right hand, defendant continued to stab Revell a total of 20 times. Following the attack, defendant made a statement that he *meant to kill the deceased.*

These simply may not be considered the actions of a terrified man. Rather, they are the actions of a man angry at the taunts of the victim challenging the defendant's status in the prison community. Such taunts do not constitute sufficient provocation to raise a "sudden heat of passion" which can rob the crime of malice and reduce it to manslaughter. *State v. Watson*, 287 N.C. 147, 214 S.E. 2d 85 (1975).

In summary, it is clear that the defendant was not entitled to a jury instruction on the lesser included offense of manslaughter. Nor was he entitled to argue this theory to the jury. The trial judge correctly refused to charge the jury on these matters as they were not supported by the evidence. *State v. Jennings*, 276 N.C. 157, 171 S.E. 2d 447. This assignment of error is overruled.

### III.

[5] The defendant testified on direct examination that he had been an inmate within the prison system for about twelve years and was currently serving a prison sentence of twenty-five to fif-

ty years imprisonment for seven counts of armed robbery. He did not elaborate on the circumstances of the crimes. On cross-examination, and over the defendant's objection, the district attorney was permitted to inquire into the specific acts committed by the defendant which resulted in the seven robbery charges of which he was convicted. Several of the robberies were committed while the defendant was armed with a knife. Without citing any authority, the defendant contends that the district attorney's "needless specific questioning . . . exceeded the bounds of recognized and accepted limits of cross-examination and thereby the defendant was materially and substantially prejudiced" in his right to a fair trial. This contention clearly lacks merit.

It is well established that a criminal defendant who takes the stand as a witness in his own behalf may, for purposes of impeachment, be asked whether he has committed specific criminal acts or has been guilty of specific reprehensible conduct. *State v. Beaty*, 306 N.C. 491, 293 S.E. 2d 760 (1982); *State v. Gainey*, 280 N.C. 366, 185 S.E. 2d 874 (1972). Therefore, the trial judge properly overruled the defendant's objections to this line of questioning.

IV.

[6] Moments after the defendant killed Alphonso Revell, he made an incriminating statement to Corrections Officer Gary Cook. Without giving the defendant any *Miranda*[1] warning, Cook asked the defendant, "What happened?" Defendant responded, "I was tired of the man f---ing with me. I meant to kill him." The State did not introduce the incriminating statement into evidence during its case-in-chief.

On cross-examination, the defendant denied that he meant to kill the decedent and denied making any statement to Cook that he meant to kill Revell. In rebuttal, the State called Officer Cook for purposes of impeaching the defendant under the rule of *State v. Overman*, 284 N.C. 335, 200 S.E. 2d 604 (1973) and *Harris v. New York*, 401 U.S. 222, 28 L.Ed. 2d 1 (1971).

Upon the defendant's objection to Cook's testimony, the trial judge sent the jury out and held a voir dire hearing to determine the admissibility of defendant's statement to Cook. Defense counsel then began to question Cook as to his police training in an

1. *Miranda v. Arizona*, 384 U.S. 436, 16 L.Ed. 2d 694 (1966).

effort to show that Cook was "aware that the proper procedure would have been to advise the defendant of his rights . . . before the defendant made his statement." The trial judge indicated that he was not interested in the officer's training and stated that "the court will determine what is the proper procedure" once defense counsel had established *what* the officer actually did. The trial judge then directed defendant to "move on."

The defendant assigns error to the denial of his efforts to question Corrections Officer Cook as to his prior police training. Defendant argues that by this line of questioning, he was attempting to lay a foundation to show that his right against self-incrimination was violated. Defendant has not assigned error to the denial of his motion to suppress the incriminating statement for *all* purposes, including impeachment.

Although they cannot be used to establish the State's case-in-chief, statements obtained by the police in violation of *Miranda* may be used to impeach the credibility of a defendant if he takes the stand in his own defense. *Harris v. New York*, 401 U.S. 222, 28 L.Ed. 2d 1; *State v. Overman*, 284 N.C. 335, 200 S.E. 2d 604. Even assuming that defendant's questions regarding Officer Cook's training would have been relevant to the issue of whether a *Miranda* violation had occurred, the trial judge acted well within his authority in controlling the hearing and directing defense counsel to focus his questions upon the actual actions of the officer with regard to the interrogation. *See State v. McDougall*, 308 N.C. 1, 22, 301 S.E. 2d 308, 321, *cert. denied*, --- U.S. ---, 104 S.Ct. 197 (1983). Moreover, the statement was properly admissible for impeachment purposes *despite* the *Miranda* violation in light of *Harris* and *Overman* and that was the sole purpose for which the State attempted to offer it. Defendant has demonstrated neither error with regard to the admission of Cook's testimony nor abuse of discretion with regard to the trial judge's control over the voir dire hearing. This assignment of error is wholly lacking in merit.

V.

[7]   Although the defendant was prepared to offer the testimony of five fellow inmates as to his good character and reputation in the Caledonia Prison, the trial judge only permitted him to present the one character witness to the jury. Charles C. Morrow

was permitted to testify before the jury that the defendant's character and reputation at the prison was good. Defendant's offer of proof for the record indicates that the excluded witnesses all testified to the effect that defendant's character and reputation was as a "good guy" who "got along with everybody," and was not known to be a "violent type." The defendant argues that the trial judge prevented him from presenting this testimony to the jury and thereby prejudiced his right to a fair trial.

The State submits that the trial judge apparently concluded that the other four witnesses were redundant because they would not have added anything to Morrow's testimony and that he acted within the bounds of his discretion in excluding this redundant evidence.

It is well-settled that a "criminal defendant, if he so elects, may always offer evidence of his good character as *substantive evidence* on the issue of guilt or innocence." (Emphasis original.) *State v. Denny*, 294 N.C. 294, 297, 240 S.E. 2d 437, 439 (1978). *See also State v. Davis*, 231 N.C. 664, 58 S.E. 2d 355 (1950); *State v. Hice*, 117 N.C. 782, 23 S.E. 357 (1895). *See generally* 1 Brandis on North Carolina Evidence § 104 (1982). Here, the defendant was permitted to offer *some* evidence of his good character, but was not permitted to offer *all* of evidence which he was prepared to offer on this issue. Thus, the question becomes one of the judge's conduct of the trial.

We have often stated that the manner of the presentation of evidence is a matter resting primarily within the discretion of the trial judge, and his control of the case will not be disturbed absent a manifest abuse of discretion. *See, e.g., State v. Harris*, 308 N.C. 159, 301 S.E. 2d 91 (1983); *State v. McDougall*, 308 N.C. 1, 301 S.E. 2d 308. The trial judge may, in his sound discretion, limit the number of character witnesses a defendant may call to the stand. *State v. Wright*, 274 N.C. 380, 163 S.E. 2d 897 (1968). While the question in this case is a close one, we agree with the State's contention that the trial judge acted within his discretion in excluding the additional character witnesses.

Moreover, assuming *arguendo* that the exclusion of the defendant's character witnesses was erroneous, any possible error was harmless within the meaning of N.C.G.S. § 15A-1443(a) or (b). Beyond any doubt the exclusion of these witnesses' recital of the

defendant's reputation in the Caledonia Prison community could not have affected the outcome of the defendant's trial, given the overwhelming evidence that the defendant sought out, attacked, chased and killed Alphonso Revell.

We have carefully reviewed the briefs of the parties, the trial transcript and the record on appeal and have concluded that defendant received a fair trial, free of prejudicial error.

No error.

Justice VAUGHN did not participate in the consideration or decision of this case.