STATE OF NORTH CAROLINA v. SHANNONE WAYNE McCLINTICK

No. 302A84

(Filed 18 February 1986)

1. **Criminal Law § 86.5— impeachment of defendant—specific acts of misconduct —pending charges—cross-examination proper**

    In a prosecution for rape, burglary and robbery, the trial court did not err in allowing the State to cross-examine defendant for impeachment purposes about his alleged involvement in certain sex offenses and other crimes in California for which he had not been tried where the questions were asked in good faith based on a police report and charges pending in California, the district attorney identified each specific act with reference to the time, place and victim, and there was no reference in the questions to charges or indictments pending against defendant. The questions were not improperly framed so as to assert in advance the untruth of defendant's denials because the questions were prefaced or followed by such expressions as, "Isn't it a fact."

2. **Criminal Law § 86.4— cross-examination of defendant—question about being "wanted" in California—harmless error**

    The trial court erred in permitting the prosecutor to ask defendant on cross-examination if he had used the name "Shannone Sherlin" because he knew he was "wanted" in California under the name of "Shannone McClintick" since the obvious inference to be gleaned by the jury from the use of the word "wanted" is that formal criminal charges against defendant were outstanding in California. However, such error was not sufficiently prejudicial so as to require a new trial where defendant had already rendered his explanation of his use of different names on direct examination, and where the evidence of defendant's guilt was so overwhelming that the jury would have convicted defendant of the offenses charged even without the error.

3. **Bills of Discovery § 6— failure to make discovery—sanctions not imposed—no abuse of discretion**

    The trial court did not abuse its discretion in failing to impose any sanctions on the State, including the exclusion of evidence, for its failure to comply with discovery where the trial court expressed displeasure with the State's

State v. McClintick

tactics with respect to discovery and did employ several of the curative actions suggested by N.C.G.S. § 15A-910, and where the court at no time determined that defendant was not provided items to which he was entitled, that defendant was harmed by the delay in receiving them, that defendant was subjected to unfair surprise at trial, or that the State had failed to comply with the law.

**4. Indictment and Warrant § 13 — motion for bill of particulars — sufficiency of State's responses**

The State's two responses to defendant's motion for a bill of particulars in a prosecution for rape, armed robbery and burglary, when considered with the indictments, sufficiently gave defendant notice of the nature of the State's allegations against him and of what role the State claimed he played in the offenses charged so as to allow him adequately to prepare his defense.

**5. Criminal Law § 89.3 — corroboration of victim — statements that she had been raped**

Testimony by the victim's mother and an emergency room nurse that the victim had told them that she had been raped and a written statement of the victim were properly admitted to corroborate the victim's testimony. The number of witnesses who may testify to a particular fact is a matter within the sound discretion of the trial judge. N.C.G.S. § 6-60.

**6. Criminal Law § 169 — answers to questions not in record — failure to show prejudice**

The appellate court cannot determine whether defendant was prejudiced by the exclusion of testimony where defendant failed to put into the record what the witnesses would have testified if they had been permitted to do so.

**7. Constitutional Law § 80; Rape and Allied Offenses § 7 — first degree rape — mandatory life sentence — not cruel and unusual punishment**

The mandatory life sentence for first degree rape provided by N.C.G.S. § 14-27.2 is not unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution.

**8. Burglary and Unlawful Breakings § 7; Rape and Allied Offenses § 6.1; Robbery § 5.4 — instructions on lesser included offenses not required**

In this prosecution for first degree rape, armed robbery and first degree burglary, defendant's statement admitted into evidence in which he acknowledged that he entered the victim's trailer after a companion broke into it and that he assisted his companion in accomplishing rape did not establish a basis for an instruction on lesser included offenses.

**9. Criminal Law § 60.5 — fingerprint evidence — time of impression — refusal to instruct**

The trial court did not err in refusing to instruct the jury that fingerprint evidence lacked probative force unless the evidence showed that the prints could have been made only at the time of the crime where there was no evidence that defendant had ever been in the victim's trailer at any time before the night of the crimes.

Justice EXUM dissenting.

APPEAL by defendant from judgments entered by *Sitton, J.*, at the 23 January 1984 session of Superior Court, BUNCOMBE County. Heard in the Supreme Court 21 November 1985.

Defendant was charged with rape in the first degree, robbery with a dangerous weapon, kidnapping in the first degree, and burglary in the first degree. Defendant entered a plea of not guilty to each offense.

At the close of all the evidence, the trial judge dismissed the charge of kidnapping in the first degree and denied defendant's other motions to dismiss. Following arguments of counsel to the jury and the judge's instructions, the jury returned verdicts of guilty of robbery with a dangerous weapon, rape in the first degree, and burglary in the first degree. Judgments were entered sentencing defendant to life imprisonment on the rape charge, fifteen years for burglary, and fourteen years for armed robbery, all sentences to run consecutively. Defendant appealed the life sentence directly to this Court pursuant to N.C.G.S. § 7A-27(a). We allowed his motion to bypass the Court of Appeals on the armed robbery and burglary convictions. For the reasons that follow, we find that defendant received a fair trial, free of prejudicial error.

*Lacy H. Thornburg, Attorney General, by Alfred N. Salley, Assistant Attorney General, for the state.*

*Scott E. Jarvis for defendant.*

MARTIN, Justice.

The state offered evidence tending to show that sometime after midnight on 5 August 1983, the seventeen-year-old defendant ran into his friend Billy Don Williams at a bar called Mack Kell's where defendant had been drinking. Williams asked defendant to go with him to pick up some money for his car payment, and Williams then drove defendant to a trailer park in Fairview. Williams parked, got out of the car, went into the trailer park, returned about five minutes later, and motioned to defendant to follow him. Williams went around the end of a trailer while defendant waited at the side. Williams entered the trailer through a window over a television set, breaking an oil lantern that was on top of the TV, and opened the door from the inside, letting defendant in. Then Williams opened a bedroom door and went in, closing the door behind him, leaving defendant in the hallway.

The victim, eighteen-year-old Mary Luanne Odom, who was awake and reading in bed, testified that she heard a crash but thought nothing of it, believing that her mother was awake and in the kitchen. She had resumed her reading when Williams came into her room with a knife in his hand and a nylon scarf over his face. After striking her in the face and knocking her over, the intruder told her not to look, that he was not going to hurt her, and that all he wanted was money. He put his hand over her mouth and asked her who else was at home and where money and valuables were. When she acknowledged that her mother was in the trailer and told him there were no valuables, he again knocked her over and put a pillow over her. He tied her hands behind her back with nylon stockings, jammed a dishcloth into her mouth, tied another dishcloth over her eyes, and tied her feet together. When she felt his hand on her leg, she broke her hands and feet loose and kicked him in the stomach, knocking his knife onto the floor. She got the pillow off her face and the blindfold off her eyes and was able to see that defendant was standing in the doorway. Defendant entered the room, closing the door behind him, and Williams said, "Get my knife. I've got to have my knife." After defendant handed Williams his knife, one with a three-inch blade, they tied Miss Odom's hands to the headboard and tied an electrical cord around her right leg. Defendant held the cord while Williams, who had threatened Miss Odom with his knife, fondled her, committed cunnilingus upon her, and had sexual intercourse with her. After Williams had completed the sex act, defendant had intercourse with her. Williams told her not to report the incident and threatened her life if she did so. The two men put a blanket and a pillow over her head and left the trailer. Miss Odom immediately woke up her mother, who had heard nothing, and they reported the incident to the police.

Later, Miss Odom discovered that her checkbook, her driver's license, her automatic teller card, a small silver cup, and a small amount of cash were missing. Miss Odom had previously written her personal code above the calendar in her checkbook, and beginning at 4:17 a.m. on 5 August 1983 and continuing through 12 August, twenty-three transactions (balance inquiries, checking and savings withdrawals, void attempts) were made on Luanne Odom's automatic teller card, resulting in total withdrawals of

$215 from Miss Odom's accounts. The card was finally captured by the machine, as its theft had been reported to bank security.

The victim sustained abrasion burns on her hands and wrists and bruises to her eye and lip. A medical examination indicated recent intercourse of a rough nature. Crime scene investigators discovered a bent window screen on the ground near the trailer, a raised window, footprints in the dirt below the window behind the TV set as well as outside Luanne's bedroom window, a footwear impression on top of the TV set, a broken oil lamp on the floor near the TV, stockings tied to the headboard and lying on the mattress, a broken electric blanket cord tied to the footpost of Luanne's bed, a pair of panties in the bed frame, fingerprints on top of the TV set, and a red bandanna on the bathroom floor. The SBI was unable to match the footwear impressions to those of any known suspects but identified a latent palm print and a right index fingerprint from the top of the TV as those of defendant. An SBI forensic serologist identified blood type of a B secretor from a vaginal swab obtained from the victim which was consistent with the blood type of defendant.

Defendant was picked up on a fugitive warrant from California on 8 September 1983 at about 1:45 a.m. Defendant and Williams were together at the time of arrest and identical sword-type knives were taken from each of them. Defendant was taken to the Buncombe County Courthouse where he was allowed to call his mother in California and was booked. At about 9:00 a.m. defendant was taken to an interview room, was served with the warrant in this case, and was read his juvenile rights. He signed a form advising him of his rights as a juvenile in the presence of two sheriff's department officers and one Asheville police officer. Defendant was read his rights one at a time, said he understood each right, and agreed to waive his right to counsel and talk to the officers as long as Asheville police officer Melvin Walsh, a friend of defendant's family, was present. At one point during the interview, defendant told "Uncle Mel" that he had not been telling the truth and that if the other two officers would leave the room, he would tell the truth. In a ten to fifteen minute private conversation between Officer Walsh and defendant, defendant told the policeman that Don Williams had let him into the trailer and that defendant did not have sex with Miss Odom but that he had held the electrical cord and watched while Williams had sex

with her. He denied any sexual contact with the victim. Defendant signed each page of a voluntary statement at 1:25 p.m.

Defendant testified at a suppression hearing regarding the admissibility of his statement, alleging that he was intoxicated on the night of his arrest. He also claimed that he had asked to see his grandparents, had requested a lawyer, and was never advised of his rights. He denied that the signature and initials on the juvenile rights form were his and that he had ever made a statement. In fact, he claimed the officers deceived him into signing the two documents by telling him they were release forms. After the voir dire hearing on the admissibility of his statement, the court found that the signatures in the name of "Shannone Sherlin" (a prior name of defendant by his natural father) and the initials "S.S." appeared to be those of defendant; that defendant was properly advised of his rights; that he was neither intoxicated nor coerced; that defendant voluntarily and understandingly waived his rights; and that defendant freely gave a statement to Officer Walsh and then to Officers Walsh, Ingle, and Mull. The court denied defendant's motion to suppress and overruled his objection to the evidence regarding the statement. Both the victim's and the defendant's statements were subsequently read into evidence.

Defendant testified in his own behalf at trial, claiming that he went to the Odoms' trailer thinking it was the home of Williams's girlfriend and that he did nothing other than stand in the living room for fifteen or twenty minutes while waiting for Williams to come from the back of the trailer. He denied having taken part in or witnessing any rape or robbery. He again claimed that he signed the juvenile rights and voluntary statement forms thinking they were release forms, and he denied having made a confession to the investigating officers or signing any documents with handwriting on them. He also testified that he was questioned after he had requested an attorney.

I.

[1] Defendant presents us with nine assignments of error. He first alleges the trial court erred in allowing the state to examine him about sex offenses and other crimes which he allegedly committed in California, contending that "these questions were so framed as to assert in advance the untruth of his denials." The

four questions objected to by defendant, which were the subject of defendant's motion in limine as well as his objections and motions to strike, were:

> Q: Mr. McClintick, on August 17, 1982, at approximately 12:15 a.m. in Anaheim, California, didn't you pry open the window in the home of a Mrs. Whitford and force her to a couch with a pair of scissors, isn't that the truth?

> Q: Mr. McClintick, on the date of August 20, 1982, at approximately 3:00 a.m. in Anaheim, California, didn't you enter the home of Mrs. Molly Moore, threaten her with a knife, tie her up with a pillowcase and attempt to pull her legs apart? Didn't you do that?

> Q: Isn't it a further fact that on that same date, August 20th, 1982, at approximately 1:45 in the morning in Anaheim, California, didn't you enter the home of Mrs. Pamela Taylor, and while you were armed with a three-foot club forced her out of her bed and onto the floor and your hand was injured in that incident, isn't that a fact, sir?

> Q: Mr. McClintick, isn't it a fact that when you came here to North Carolina you used the name Shannone Sherlin because you knew you were wanted in California under the name of Shannone McClintick? Isn't that a fact?

Noting that these questions were based on a police report and charges pending in California, defendant objects to both the form and the content of the questions and argues that they "were framed in such a fashion that regardless of how they were answered by Defendant-Appellant the jury had to be left with an impression that they constituted a statement of fact." Specifically, he takes umbrage at the district attorney's preceding and ending her questions with phrases such as "isn't it a fact . . .," and he asserts that the questions would have been more properly phrased in the form, "Did this event happen?"

Defendant cites *State v. Phillips*, 240 N.C. 516, 82 S.E. 2d 762 (1954), to support his contention that argumentative and accusatory questions, framed as to assert in advance the untruth of his denials, deprived him "of the benefit of the evidential rule that the State is bound by the answers of the accused or any other witness for the defense when it cross-examines him as to col-

lateral matters for the purpose of impeachment," *id.* at 524, 82 S.E. 2d at 768, and caused such prejudice to defendant's credibility as to warrant a new trial. Further, defendant relies on *State v. Baker*, 312 N.C. 34, 320 S.E. 2d 670 (1984), to bolster his claim that a defendant may not be cross-examined on collateral crimes by the use of questions "which assume as facts unproved insinuations of the defendant's guilt of collateral offenses." *Id.* at 46, 320 S.E. 2d at 678 (citing *Phillips*, 240 N.C. at 524, 82 S.E. 2d at 767). As we perceive a distinction between the first three questions objected to and the fourth, we will first address the former as a whole.

Although this Court has forbidden cross-examination for impeachment purposes by referring to indictments, charges, arrests, or accusations on collateral criminal offenses, *State v. Shane*, 304 N.C. 643, 651, 285 S.E. 2d 813, 818 (1982), *cert. denied*, 104 S.Ct. 1604, 80 L.Ed. 2d 134 (1984); *State v. Williams*, 279 N.C. 663, 672, 185 S.E. 2d 174, 180 (1971); *see* 1 Brandis on North Carolina Evidence § 112, at 416 (1982 & Supp. 1983 at n. 57), it is equally well settled in this jurisdiction that as long as certain requirements are met, a criminal defendant may be cross-examined for impeachment purposes about specific *acts* of misconduct, *Shane*, 304 N.C. at 648, 285 S.E. 2d at 817; *State v. Lynch*, 300 N.C. 534, 268 S.E. 2d 161 (1980); N.C.R. Evid. 608(b) (1984); 1 Brandis on North Carolina Evidence § 112, at 416-17, and in rare instances he may even be asked whether he committed criminal acts. *State v. McCray*, 312 N.C. 519, 324 S.E. 2d 606 (1985); *State v. Beaty*, 306 N.C. 491, 293 S.E. 2d 760 (1982); *State v. Royal*, 300 N.C. 515, 268 S.E. 2d 517 (1980). The rationale for allowing such delving into the defendant's former transgressions was enunciated in *State v. Purcell*, 296 N.C. 728, 252 S.E. 2d 772 (1979), where the Court, via Justice Exum, explained:

> The purpose of permitting inquiry into specific acts of criminal or degrading conduct is to allow the jury to consider these acts in weighing the credibility of a witness who has committed them. For this purpose to be fulfilled, the questions put to the witness must enlighten the jury in some degree as to the nature of the witness' acts.

*Id.* at 733, 252 S.E. 2d at 775. For this reason questions similar to those sub judice were held proper in *State v. Ashley*, 54 N.C.

App. 386, 283 S.E. 2d 805 (1981), *disc. rev. denied*, 305 N.C. 153 (1982). In that case, the Court of Appeals' reasoning for allowing cross-examination of the defendant regarding his alleged involvement in crimes for which charges were pending against him in Florida was based on the fact that by taking the stand and testifying in his own behalf, the defendant forfeited his privilege against self-incrimination and was subject to impeachment by questions which related to specific acts of criminal conduct. *State v. Ross*, 295 N.C. 488, 246 S.E. 2d 780 (1978); *State v. Foster*, 284 N.C. 259, 200 S.E. 2d 782 (1973). As we observed in *Ross*, where we pointed out that such a wide scope of impeachment aids the jury in assessing a defendant's self-serving testimony, the "likelihood of undue prejudice accruing from the attempted impeachment . . . does not outweigh the court's substantial interest in arriving at the truth." 295 N.C. at 493, 246 S.E. 2d at 785.

The only limitations placed upon the prosecution in making inquiry into the defendant's previous iniquities are that there be factual bases for the questions and that they be asked in good faith, *State v. Shane*, 304 N.C. 643, 648, 285 S.E. 2d 813, 817; *State v. Lynch*, 300 N.C. 534, 268 S.E. 2d 161; *State v. Gaiten*, 277 N.C. 236, 176 S.E. 2d 778 (1970); that the questions be content-neutral, *State v. Black*, 283 N.C. 344, 196 S.E. 2d 225 (1973); and that the subject matter of the questions be within the knowledge of the witness, *State v. Purcell*, 296 N.C. 728, 732, 252 S.E. 2d 772, 775 (quoting *State v. Williams*, 279 N.C. 663, 675, 185 S.E. 2d 174, 181). The scope of the questions are subject to the discretion of the trial judge, *Purcell*, 296 N.C. at 732, 252 S.E. 2d at 775.

In the case before us, following defendant's objections the trial judge dismissed the jury after the district attorney's second question for the purpose of conducting a brief voir dire on the admissibility of the inquiries. During this hearing, defendant made motions to strike the first two questions. The trial judge informed defendant that the questions were proper under *State v. Shane*, 304 N.C. 643, 285 S.E. 2d 813, and other North Carolina Supreme Court cases permitting a criminal defendant to be cross-examined about prior acts of misconduct, even those for which the defendant had not been convicted, for impeachment purposes, as long as the questions were asked in good faith. He then inquired of the state as to the good faith basis of its questions. The state responded that it possessed the complete police file on defendant

(against whom extradition proceedings had been filed in California and were pending at the time of this trial and who was arrested on a fugitive warrant issued in that state) with the facts of the California police investigation into those incidents; that defendant's fingerprints were found in the victim's home after the 17 August incident; and that the victim identified defendant as the perpetrator of the incident asked about in the second question. The trial judge specifically found that the questions were asked by the state in good faith, and the jury was returned to the courtroom. The state then proceeded to ask the last two questions complained of here. Defendant answered "no" to all four questions.

We see no abuse of discretion in permitting these questions. Their good faith basis was demonstrated to the satisfaction of the trial judge. The district attorney asked the defendant about each incident, properly identifying each specific act with a reference to the time, place, and victim of defendant's alleged prior misconduct, *State v. Shane*, 304 N.C. 643, 652, 285 S.E. 2d 813, 819; *State v. Purcell*, 296 N.C. 728, 732-33, 252 S.E. 2d 772, 775, and did not allude to the fact that formal charges were pending against defendant in each of these incidents in violation of *State v. Williams*, 279 N.C. 663, 185 S.E. 2d 174. Further, we do not agree that the form of these questions was improper. They were not, as in *Shane* and *Purcell*, inadequate because they did not inquire about some "identifiable specific act on defendant's part," *Purcell*, 296 N.C. at 732, 252 S.E. 2d at 775; there was no reference to charges or indictments as in *Williams*; and we disagree with defendant that the questions were improperly framed "as to assert in advance the untruth of his denials," thereby depriving him "of the evidential rule that the State is bound by the answers of the accused . . . when it cross-examines him as to collateral matters for the purpose of impeachment," said to be impermissible in *State v. Phillips*, 240 N.C. 516, 524, 82 S.E. 2d 762, 768, and *State v. Baker*, 312 N.C. 34, 320 S.E. 2d 670. The form of the questions here, prefaced and followed by such expressions as, "Isn't it a fact," were merely leading and were no more accusatory than any other question customarily asked on cross-examination. We therefore do not find defendant's attempts to invoke the rulings in *Phillips* and *Baker* to be persuasive; whether the district attorney asked the questions in the form, "Did you . . .?" or "Didn't

you . . .?" is merely semantical. Moreover, the state's query into each matter ended upon the defendant's flat denial, so not only was the rule against offering extrinsic evidence to challenge defendant's denials not violated, *State v. Shane*, 304 N.C. 643, 653, 285 S.E. 2d 813, 819; 1 Brandis on North Carolina Evidence § 111, at 410; N.C.R. Evid. 608(b), but defendant's denials were conclusive and made the questions harmless. *State v. Black*, 283 N.C. 344, 196 S.E. 2d 225 (where questions substantially similar to those presently before us were held proper). Nor was the probative value of the questions outweighed by danger of unfair prejudice, confusion of issues, or misleading the jury. *See* N.C.R. Evid. 403 (effective 1 July 1984). We find no error in the admission of the first three questions and answers.

[2] The prosecutor's fourth question, however, does give us pause for some concern. As discussed previously, evidence that a witness has been accused, arrested, indicted, or is under indictment for criminal offenses other than and unrelated to that for which he is then on trial is inadmissible. *State v. Williams*, 279 N.C. 663, 672, 185 S.E. 2d 174, 180. Here the prosecutor asked the defendant if he used the name "Shannone Sherlin" because he knew he was *wanted* in California under the name of "Shannone McClintick." The obvious inference to be gleaned by the jury from the use of the word "wanted" is that formal criminal charges against defendant were outstanding in California. This clearly was impermissible under *Williams*, and it was error to admit it. However, as noted in *Williams*, whether a violation of this rule amounts to a sufficient ground for a new trial depends on the circumstances of the individual case. 279 N.C. at 674, 185 S.E. 2d at 181. A review of the transcript shows us that on direct examination, the following exchange occurred between the defendant and his attorney:

Q. Mr. McClintick, have you also been known by the name Shannone Sherlin?

A. I was—that's my born name. I was born under that name.

Q. And did you have another name, last name, by the name of Brackett?

A. Yes, I was adopted.

Q. Would you explain that to the jury, please?

A. My mother had married a police officer of the name of Brackett, and he adopted me until I was 11 years old, and I left for California at that time.

. . . .

At that time, after I was born, my mother had married a police officer named Bud Brackett, and he adopted me at that time.

Q. Then your name became McClintick, is that correct?

A. After I moved to California my second stepdad adopted me then.

On oral argument, the state contended that it had a good faith belief that defendant had changed his surname from "McClintick" to "Sherlin" when he moved back to North Carolina in order to attempt to avoid apprehension for the California crimes and that it was a plausible explanation for defendant's change of name. Equally plausible is the theory that defendant preferred to use the name by which he was known in North Carolina when he lived in this state as a child. In any event, defendant had already rendered his explanation on direct examination; he did not further elucidate on cross-examination; the state did not attempt to press him on the issue but accepted his denial as final. As "[d]efendant's negative answers were conclusive and rendered the questions harmless," *State v. Black*, 283 N.C. 344, 350, 196 S.E. 2d 225, 229, we do not find that the error was sufficiently prejudicial so as to warrant a new trial. Moreover, considering the victim's certain identification of defendant, the defendant's inculpatory statement, and the other evidence tending to establish his guilt, we think the evidence is so overwhelming that the jury would have convicted defendant of the offenses charged even without the error. N.C.G.S. § 15A-1443(a) (1983). This assignment of error is overruled.

II.

Next, defendant alleges that the state in bad faith failed to comply with discovery requirements, and he asks that the trial court's discretionary rulings permitting admission of certain evidence be overturned on the grounds that the state's actions

hampered his defense and denied him a fair trial. However, defendant has failed to show how he was prejudiced. We do not perceive that the outcome would have differed or that defendant's defense would have been conducted differently had this information been provided or provided earlier, and because we believe that the trial judge "bent over backwards" to accommodate the defendant by granting recesses and continuances and holding hearings on these discovery matters, we find no abuse of discretion in the trial judge's failure to impose sanctions on the state or admitting the evidence complained of.

Defendant made timely requests for discovery and moved for a bill of particulars.

Specifically, because the state did not provide a copy of a fingerprint report and fingerprint cards until fifteen to twenty minutes prior to the commencement of the trial, defendant contends that all fingerprint evidence should have been excluded. He argues that the testimony of the victim should have been excluded because the state did not furnish him with a copy of her statement, to which defendant apparently believes he was entitled so that he could examine it for exculpatory material. Defendant also objects to the admission of the testimony of Pat Ward, the Buncombe County Jail nurse who drew a blood sample from defendant, because the state had not disclosed that she was a potential witness. He argues further that the state did not make sufficient discovery of the bank transactions record because the copy furnished him differed in several respects from the transaction record produced in court. Finally, defendant objects to the admission into evidence of a juvenile rights waiver form without discovery and the testimony of police officer Walsh as to statements defendant made after he signed the form, particularly in light of the fact defendant strenuously denied that any such form existed. In addition to these contentions, defendant also objects to the trial court's denial of his last motion to continue.

[3] Neither the North Carolina discovery statute, N.C.G.S. §§ 15A-902 to -910, nor the case of *Brady v. Maryland*, 373 U.S. 83, 10 L.Ed. 2d 215 (1963), requires the trial court to impose any sanctions for failure to comply with discovery. *State v. Alston*, 307 N.C. 321, 298 S.E. 2d 631 (1983). The determination as to whether the state substantially failed to comply with discovery is

within the trial judge's discretion. *State v. King*, 311 N.C. 603, 320 S.E. 2d 1 (1984); *State v. Dukes*, 305 N.C. 387, 289 S.E. 2d 561 (1982). This Court has held that discretionary rulings of the trial court will not be disturbed on the issue of failure to make discovery absent a showing of bad faith by the state in its noncompliance with the discovery requirements. *State v. Brown*, 306 N.C. 151, 293 S.E. 2d 569 (1982); *State v. Lampkins*, 286 N.C. 497, 212 S.E. 2d 106 (1975), *cert. denied*, 428 U.S. 909 (1976); *State v. Carter*, 289 N.C. 35, 220 S.E. 2d 313 (1975). In the case before us, although the trial judge did not impose any sanctions for failure to comply with discovery and indeed expressed his displeasure with the state's tactics with respect to discovery, he did in fact employ several of the curative actions suggested by N.C.G.S. § 15A-910. Certain items of evidence were made available to defendant and he was given time to study them; in fact, some recesses were granted for this purpose. Some items, the existence of which were not disclosed to defendant, were excluded. It is obvious from the record that the trial judge disapproved of the state's delay in compliance and not providing defendant with certain items, the furnishing of which were not required but which could have been provided without burdening the state's case. However, at no time did he determine that defendant was not provided items to which he was entitled, that defendant was harmed by the delay in receiving them, that defendant was subjected to unfair surprise at trial, or that the state had failed to comply with the law. *See State v. Taylor*, 311 N.C. 266, 316 S.E. 2d 225 (1984) (no error to deny defendant's motion for sanctions where defense counsel was afforded opportunity to examine evidence before the opening of court the next day). We fail to find any abuse of discretion.

## III.

[4] Turning now to defendant's next contention, he alleges that the trial court erroneously ruled that the state's "Further Answers" to his request for a bill of particulars were sufficient. In its first bill of particulars, the state had indicated that the two defendants had played substantially different roles, with one being a primary actor and the other being a secondary actor or accomplice. The amended bill indicated that the state would attempt to prove that defendant committed the crimes in question and also encouraged and aided Williams to commit the same

crimes, and the state actually proceeded on a theory that the two defendants were acting in concert. Defendant argues that the state's amended response was inadequate to apprise him of the nature of the state's allegations against him and of what role the state claimed he played in the offenses charged. This, combined with the state's delayed compliance with discovery procedures, left him subject to being surprised at trial, denying him a fair trial, he says, and he asserts that the trial judge abused his discretion by not requiring more from the state. *State v. Westry; State v. McCutcheon; State v. Miller; State v. Abbney*, 15 N.C. App. 1, 11-12, 189 S.E. 2d 618, 625, *cert. denied*, 281 N.C. 763 (1972).

The state's original answer to the request for a bill of particulars supplied defendant with the following information:

(1) These offenses occurred between the hours of 3:00 a.m. and 4:00 a.m.

(2) These offenses occurred at the residence of the victim.

The state's Further Answers provided:

1) That the defendant raped Luanne Odom.

2) That the defendant aided Billy Don Williams in the rape of the victim.

3) That the defendant conspired with Billy Don Williams for either one or both of said parties to rape Luanne Odum [sic].

4) That the defendant procured, counseled, commanded, and encouraged Billy Don Williams to rape Luanne Odum [sic].

That the defendant did the same as alleged in one through four above in regards to First Degree Burglary Charge, Armed Robbery, and First Degree Kidnapping.

Combined with the information contained in the four indictments of defendant, which between them gave the date, time, and exact place of the offenses, the name of the victim, the type of weapon used, the occupants of the house at the time of the crimes, and the items taken from the premises, defendant certainly was

charged with notice of the nature of the state's allegations against him and of what role defendant played in the charged offenses. The trial court found as much and entered into the record its detailed findings to the effect that the state's responses to defendant's motion provided all the information necessary to allow defendant to adequately prepare his defense. We find no abuse of discretion.

## IV.

[5] Next, defendant alleges that certain evidence corroborative of the victim's testimony should not have been admitted. Specifically, the trial judge allowed Nina Odom, the victim's mother, and an emergency room nurse, Cathy Buckner, to testify that the victim had told them that she had been raped, describing some of the surrounding circumstances. Additionally, a written statement of the victim was introduced into evidence and displayed to the jury. Defendant argues that this evidence was inadmissible and prejudicial because it merely repeated direct allegations that a crime had been committed rather than corroborating details of the victim's story and suggests that to allow such testimony would be to encourage situations where the more the victims complain to people around them, the more their accusations will be made and repeated in court. Defendant concedes there is no existing authority in support of his position but urges us to create a rule placing limits on corroborative evidence once it is shown that the present memory of the witness is in harmony with the witness's earlier statement.

Contrary to defendant's concession, there is ample authority enabling the trial judge to limit the number of witnesses a party may call to prove a fact in issue. The number of witnesses who may testify to a particular fact is a matter within the sound discretion of the trial judge. *State v. Wright*, 274 N.C. 380, 163 S.E. 2d 897 (1968). *See also* N.C.G.S. § 6-60 (1981). We find no abuse of discretion by the trial judge. The assignment of error is overruled.

## V.

[6] Defendant next argues that the trial court erred in not receiving corroborating evidence of defendant's statement that he requested an attorney during his interrogation. There was con-

flicting evidence at trial as to whether defendant had requested the presence of an attorney during his initial police interview and the taking of his statement. Defendant testified that he had made such a request. However, the trial court refused to allow the defendant to ask two defense witnesses whether defendant had called them on the telephone and told them that he desired the presence of an attorney. Defendant says that these statements were important to his defense as corroboration of his prior statement and to enhance his credibility and, further, that the admissibility and validity of his confession hinges in part upon the resolution of this issue.

When the state's objection was sustained, defendant failed to put into the record what the witnesses would have testified if they had been permitted to do so. Therefore, we cannot determine whether defendant was prejudiced by the court's ruling. *See State v. Martin*, 294 N.C. 253, 240 S.E. 2d 415 (1978).

## VI.

[7] Defendant next contends that N.C.G.S. § 14-27.2, providing for a mandatory life sentence for a conviction of rape in the first degree, is unconstitutional under the eighth and fourteenth amendments to the United States Constitution. This question has already been answered by this Court contrary to the defendant's contention. *See State v. Peek*, 313 N.C. 266, 328 S.E. 2d 249 (1985).

## VII.

[8] Defendant contends that the trial court erred in failing to instruct on lesser included offenses. He admits that his testimony does not establish a basis for an instruction on lesser included offenses but contends that his written statement which was admitted into evidence does. In this statement, he acknowledges entering the Odoms' trailer after Williams broke into it, and he confesses to assisting Williams in accomplishing rape. He denies entering the trailer with the intent to commit larceny or rape and further denies that he stole anything. We have carefully scrutinized defendant's statement as contained in the record and do not find any evidence of lesser crimes. As the state wryly noted in its brief, "[defendant's] testimony, if believed, contains no evidence of the intentional commission of any crime." Defendant's assignment of error is overruled.

## VIII.

Defendant's eighth argument is that the trial court erred in denying his motion for appropriate relief. In this assignment, defendant argues that he was prejudiced by the failure of the state to provide him with discovery; that the court erroneously admitted into evidence his inculpatory statement; that the court permitted the state to cross-examine him on prejudicial matters concerning outstanding charges against him in California which he alleges were unsupported by the evidence; that the charge to the jury on various offenses was inadequate because of the "acting in concert" language used by the trial judge; that a number of evidentiary rulings were prejudicial; that the state argued improperly during closing argument by injecting personal belief and feeling into the argument; and that the evidence at the close of all the evidence was insufficient to justify submission of the case to the jury on charges or rape and burglary in the first degree and armed robbery.

[9] We have already discussed most of the grounds for defendant's motion. Of the remaining grounds, the only one which conceivably has merit relates to defendant's objection to the trial judge's refusal to instruct the jury that the fingerprint evidence lacked probative force unless the evidence showed that the prints could have been made only at the time of the crime, as required in *State v. Bradley*, 65 N.C. App. 359, 309 S.E. 2d 510 (1983). However, as there was no evidence in this case that defendant had ever been in the Odoms' trailer at any time before the night of the rape, we do not find it necessary to reach this issue. We find this assignment of error to be without merit.

## IX.

Finally, defendant alleges he was denied a fair trial because the trial court indicated to the jury that it favored the prosecution. Defendant's only evidence of impropriety is the rulings the trial judge made which were unfavorable to defendant. This assignment of error is frivolous.

After scrupulous examination of the entire record before us, we find no prejudicial error.

No error.

Justice EXUM dissenting.

I disagree with the majority's conclusion that the state's cross-examination of defendant concerning the incidents allegedly occurring in California was not reversible error. The obvious effect of these four questions taken together and set out verbatim in the majority opinion was to convey to the jury that defendant had been charged in California with three assaults similar in nature to the assault for which he was being tried. The questions were thus improper under *State v. Williams*, 279 N.C. 663, 185 S.E. 2d 174 (1971). Since the jury undoubtedly got this message, there is a reasonable possibility the result may have been different had the message not been conveyed. The result, in my view, is reversible error entitling defendant to a new trial.

Even if the first three questions, considered as the majority does apart from the fourth, are construed to be mere inquiries into acts of misconduct designed only to impeach defendant's credibility, the prejudicial impact of the questions far outweighs their probative value for this purpose. *See State v. Stone*, 240 N.C. 606, 83 S.E. 2d 543 (1954); *see also* N.C.G.S. § 8C-1, Rule 403. Under our new rules of evidence, effective 1 July 1984, such cross-examination will not be permitted even for impeachment purposes. N.C.G.S. § 8C-1, Rule 608(b). In my view it should not have been permitted in this case.