STATE OF NORTH CAROLINA v. MICHAEL ANTHONY NOLEN

No. COA00-855

(Filed 19 June 2001)

**1. Criminal Law— mistrial denied—Fifth Amendment privilege asserted**

The trial court did not err in a prosecution for first-degree murder and armed robbery by not granting a mistrial where a witness was allowed to assert a blanket Fifth Amendment privilege to all questions asked by defense counsel. The defense questions could have been links in the chain of evidence against the witness and could have harmed him in a subsequent trial; moreover, any error regarding the privilege was harmless beyond a reasonable

STATE v. NOLEN

[144 N.C. App. 172 (2001)]

doubt because there was overwhelming evidence of defendant's guilt and because the testimony was cumulative at best.

**2. Jury— summoning of additional jurors—statute facially constitutional**

There was no error in a first-degree murder and robbery prosecution where the court ordered the sheriff to summon additional jurors but all of those supplemental jurors were eventually excused. Although there is a possibility of abuse in the jury selection process under N.C.G.S. § 9-11, it is also important to give the sheriff discretion so that he may carry out his duties and the statute is constitutional on its face.

**3. Discovery— trigger pull test—no notice**

The trial court did not abuse its discretion in a first-degree murder and armed robbery prosecution by admitting evidence of a trigger pull test conducted by an S.B.I. agent where defendant contended that he was not notified that the agent would testify about trigger pull tests. The prosecutor fulfilled his duty by providing defendant with a copy of the agent's report, even though it did not contain the trigger pull information. Moreover, even if the prosecutor's actions constituted a discovery violation, the court retained discretion to determine whether sanctions were appropriate, defendant never made a motion for discovery of test results but relied on the State's "open file" policy, and there was no unfair surprise or bad faith.

**4. Evidence— defendant's appearance on the night of the crimes—other evidence admitted**

There was no prejudice in a prosecution for first-degree murder and armed robbery where defendant contended that the court erred by sustaining the State's objections to questions eliciting information about whether defendant appeared drunk and irrational on the night of the crime, but defendant elicited testimony from other witnesses who saw him consume drugs and alcohol throughout the day before the commission of the crimes.

**5. Homicide— short-form murder indictment—constitutional**

The short-form murder indictment is constitutional.

Appeal by defendant from judgment entered 2 September 1999 by Judge B. Craig Ellis in Bladen County Superior Court. Heard in the Court of Appeals 16 May 2001.

*Attorney General Michael F. Easley, by Special Deputy Attorney General Thomas F. Moffitt, for the State.*

*Lisa Miles for defendant appellant.*

McCULLOUGH, Judge.

Defendant Michael Nolen was tried before a jury at the August 1999 Session of Bladen County Superior Court. Evidence for the State showed that on 24 July 1998, defendant went to a party in Dublin, North Carolina, arriving between 5:30 p.m. and 6:00 p.m. Soon thereafter, defendant began drinking hard liquor with some of the partygoers. Defendant went to the party with his friend David Wilkins and a woman; once there, he met Jeffrey Hunt for the first time. The party was at the home of Hunt's grandmother, Juanita Jones.

Defendant, Wilkins, and Hunt decided to go to a nightclub later that evening. Wilkins first drove the three men to Tar Heel, North Carolina, to collect $50.00 a man owed him. When they discovered that the individual was not at home, Hunt drove the Toyota truck to the Scotchman convenience store to buy gasoline. By this time, it was almost 7:00 p.m. and getting dark.

Defendant pumped gasoline and talked to Wilkins. According to Hunt, defendant told Wilkins to "[g]o ahead now, while there's nobody around." Hunt testified that he asked, "Do what?" but neither Wilkins nor defendant would answer him. At that point, Hunt noticed that Wilkins had a handgun. Hunt offered to pay for the gasoline, so defendant and Wilkins would not go into the convenience store, but Wilkins handed defendant the gun and forced Hunt into the truck at defendant's request. Wilkins drove the truck around to the front of the store while defendant went inside; Hunt sat on the front seat next to him. Wilkins and Hunt heard a shot while defendant was inside the store; defendant then emerged, got into the passenger side of the truck, and said, "Go, go, go!" The three men drove away toward Bladenboro on Highway 301.

Hunt testified that defendant was yelling, vomiting, and shooting the gun outside the truck's window while Wilkins drove. Defendant also punched the windshield with his fist. According to Hunt, Wilkins asked defendant if he had gotten any money; defendant told him to "[j]ust keep driving." Soon thereafter, the three men noticed a police car following them, with its blue lights flashing. Defendant took the money he had stolen from the Scotchman, threw some at Wilkins and stuffed some bills into Hunt's pants pocket because he

believed the police would not be able to trace the money if people other than himself had possession of it. Wilkins drove on, and the police continued to follow the truck for several miles. Hunt stated that defendant threw his Chicago Bulls t-shirt, the gun, and a Jim Beam bourbon bottle out of the truck window while the police car followed closely.

Bladen County Sheriff's Deputy Rodney Hester testified that he saw objects being thrown from the vehicle before it was stopped. As soon as the police stopped the truck, Wilkins emerged with his hands up. Deputy Hester patted him down and placed him in the patrol car. By that time, two other law enforcement officers arrived on the scene and Hunt and defendant got out of the truck on their own. Hunt immediately told the officers he would give a complete statement.

Hunt recounted the day's events and told the police that he had been drinking and smoking marijuana at his grandmother's party. He also stated that defendant and Wilkins consumed a large quantity of Jim Beam liquor from a half-gallon bottle, and that he saw Wilkins with the gun at the party earlier that evening; however, he did not become concerned because he had known Wilkins since childhood.

Hunt then related what happened after he, Wilkins and defendant arrived at the Scotchman convenience store. Hunt told police that other customers were around the gas pumps, but that he did not try to get away or ask for help after he realized that defendant and Wilkins intended to rob the store. He told the police that while defendant was in the store, he heard a gunshot, and further explained that he later asked defendant if anyone had been shot, to which defendant replied, "Nobody." When defendant took the witness stand at trial, he maintained that the gun simply went off. However, the store's surveillance camera revealed that defendant shot the cashier, Ms. Dorothy Jordan, once in the shoulder. He also got away with a quantity of paper money from the register. Though a customer soon found Ms. Jordan and called an ambulance, Ms. Jordan ultimately died of the gunshot wound inflicted by defendant.

A number of individuals testified during trial. The State's witnesses included gun experts, law enforcement officers who assisted at the crime scene and took defendant into custody, and medical experts. Defendant presented evidence from witnesses who testified that he had consumed a large amount of alcohol, cocaine, Valium, and marijuana during the day in question. Defendant also presented med-

ical experts, psychologists, and gun experts. Defendant testified on his own behalf and stated that he did not recall any of the events leading to the robbery of the Scotchman convenience store or Ms. Jordan's death, though he conceded that he was the man caught on the store's surveillance videotape.

The jury considered a charge of first-degree murder and superseding charges of robbery with a dangerous weapon and conspiracy to commit robbery with a dangerous weapon. The jury found defendant guilty of all three offenses. Upon the jury's recommendation, the trial court sentenced defendant to life in prison without parole for the first-degree murder conviction and to a consecutive term of 34 to 50 months' imprisonment for conspiracy to commit robbery with a dangerous weapon. The trial court arrested judgment for the robbery with a dangerous weapon charge. Defendant appealed.

Defendant asserts that the trial court erred by (I) allowing codefendant David Wilkins' blanket assertion of his Fifth Amendment privilege and denying defendant's motion for a mistrial; (II) overruling defendant's objection to juror selection under N.C. Gen. Stat. § 9-11 (1999); (III) allowing testimony from S.B.I. Agent Tom Trochum regarding results of "trigger pull" tests conducted on the alleged murder weapon; (IV) sustaining the State's objection to questions tending to elicit evidence of defendant's degree of intoxication; and (V) entering judgment against defendant for first-degree murder using the short-form murder indictment. For the reasons stated below, we disagree with defendant's assertions and affirm the trial court's actions in all respects.

## Codefendant's Assertion of Fifth Amendment Privilege

[1] Defendant argues that the trial court erred in allowing David Wilkins to assert a blanket Fifth Amendment privilege to all questions asked by defense counsel. At trial, defendant called Wilkins to the witness stand in hopes of uncovering exculpatory information. Wilkins took the stand, accompanied by his attorney, where the following colloquy took place:

Q. Good morning, Mr. Wilkins.

Sir, I'd like you to begin by stating for His Honor and the members of the jury your full name.

A. David Earl Wilkins.

Q. How old are you, sir?

**MR. WILLIS** [Wilkins' attorney]: Your Honor, at this time, pursuant to the provisions of the Fifth Amendment of the United States Constitution and Article 1, Section 23 of North Carolina Constitution, my client desires to invoke his right against self-incrimination by not testifying any further and I would advise him not to answer any further questions that may be propounded to him by counsel for the Defendant.

Both attorneys approached the bench and defendant's counsel asked the trial court to order Wilkins to answer all questions which the trial court deemed non-incriminating, in effect challenging Wilkins' previous assertion of his Fifth Amendment privilege. Defendant's attorney also asked the trial court to consider each question's potential for incrimination on a question-by-question basis. After considering the matter, the trial court stated:

**THE COURT**: I'm going to decline to do that. I don't think that I have the authority to order him to answer something that I may not think would be incriminating, but he and his attorney think are incriminating. The Fifth Amendment gives him the right to refuse to answer.

And I note your exception to that.

The trial court allowed a continuing objection throughout every question and allowed defendant's attorney to ask several of his questions, though Wilkins' attorney invoked Wilkins' Fifth Amendment privilege for each question. Defendant moved for a mistrial and, in the alternative, asked the trial court to reopen the evidence so that he could elicit non-incriminating evidence. The trial court denied both of defendant's proposals and allowed the case to continue.

When a witness invokes his Fifth Amendment privilege, the trial court must decide whether one can reasonably infer from the question that the answer may incriminate the witness. *State v. Pickens*, 346 N.C. 628, 637, 488 S.E.2d 162, 167 (1997). If the trial court determines that the witness' answer will not be self-incriminating, "the trial court may compel the individual to answer the question." *State v. Eason*, 328 N.C. 409, 419, 402 S.E.2d 809, 813 (1991). A witness may invoke his Fifth Amendment privilege if the evidence can be used against him in a criminal prosecution, or if the evidence can furnish a "link in the chain" of evidence needed to prosecute that witness. *Pickens*, 346 N.C. at 637, 488 S.E.2d at 167. Invocations of one's Fifth Amendment privilege are to be liberally construed. *Id.*

In this case, defendant's questions would have placed Wilkins at the crime scene and would have allowed Wilkins to be cross-examined regarding conversations he had with defendant. It is also likely that defendant's counsel would have uncovered the fact that Wilkins gave defendant the gun used in the robbery of the Scotchman convenience store and in the subsequent murder of Ms. Jordan. The defense's questions could have been "links in the chain" of evidence against Wilkins and could have harmed Wilkins at a subsequent trial. *See State v. Ray*, 336 N.C. 463, 444 S.E.2d 918 (1994) (explaining that an accomplice who invokes his Fifth Amendment privilege cannot testify about part of a criminal transaction and remain silent about the other events).

Defendant argues that the trial court's failure to grant his motion for a mistrial constitutes reversible error. Defendant points to N.C. Gen. Stat. § 15A-1061 (1999), which states that

> [u]pon motion of a defendant or with his concurrence the judge may declare a mistrial at any time during the trial. The judge must declare a mistrial upon the defendant's motion if there occurs during the trial an error or legal defect in the proceedings, or conduct inside or outside the courtroom, resulting in substantial and irreparable prejudice to the defendant's case. If there are two or more defendants, the mistrial may not be declared as to a defendant who does not make or join in the motion.

Our standard of review is dictated by N.C. Gen. Stat. § 15A-1443(b) (1999), which explains that

> [a] violation of the defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt. The burden is upon the State to demonstrate, beyond a reasonable doubt, that the error was harmless.

" '[A] mistrial should be granted only when there are improprieties in the trial so serious that they substantially and irreparably prejudice the defendant's case and make it impossible for the defendant to receive a fair and impartial verdict.' " *State v. Bonney*, 329 N.C. 61, 73, 405 S.E.2d 145, 152 (1991) (quoting *State v. Warren*, 327 N.C. 364, 376, 395 S.E.2d 116, 123 (1990)); *see also* N.C. Gen. Stat. § 15A-1061. Thus, even if the trial court errs, the error must be harmful beyond a reasonable doubt for a mistrial to be properly granted. *Pickens*, 346 N.C. at 640, 488 S.E.2d at 168-69. In defendant's case, any error regarding Wilkins' Fifth Amendment privilege was harmless

STATE v. NOLEN

[144 N.C. App. 172 (2001)]

beyond a reasonable doubt, given the overwhelming evidence of defendant's guilt. Defendant hoped to elicit from Wilkins' testimony to bolster his defense that he was in an alcohol and drug induced blackout when the robbery and murder took place. However, defendant's argument overlooks the point that he successfully presented a great deal of evidence of his alcohol and drug consumption, corroborated by several witnesses. Wilkins' testimony added no new information, and was corroborative and cumulative at best. Even if Wilkins answered all the questions in the manner defendant wanted, there would still have been ample evidence to support the jury's guilty verdict.

The trial court has sole discretion to decide whether to grant a mistrial in a particular case. As defendant cannot show an abuse of discretion by the trial court, its ruling cannot be disturbed on appeal. Defendant's first assignment of error is overruled.

### Summoning of Additional Jurors

[2] Defendant next argues that the trial court erred in ordering the sheriff to summon additional jurors pursuant to N.C. Gen. Stat. § 9-11(a) (1999). The statute provides that

> [i]f necessary, the court may . . . order the sheriff to summon from day to day additional jurors to supplement the original venire. . . . If the presiding judge finds that service of summons by the sheriff is not suitable because of his direct or indirect interest in the action to be tried, the judge may appoint some suitable person in place of the sheriff to summon supplemental jurors.

The shortage of eligible jurors in defendant's case was partly due to the fact that the case was highly publicized. The robbery and murder occurred in the small town of Tar Heel, where many people knew the victim, and the crime generated a great deal of news coverage. These factors significantly reduced the number of eligible jurors, thereby creating a situation in which N.C. Gen. Stat. § 9-11 was needed. When it became evident that the jury pool was too small to supply a sufficient venire, the trial court told the Sheriff to "go out and bring in 15 more people for in the morning." Defendant objected at that time, and also filed a written objection to the trial court's use of N.C. Gen. Stat. § 9-11. The trial court heard arguments from both sides, then determined that the statute was constitutional and denied defendant's motion to dismiss the eleven supplemental jurors who were summoned by the Sheriff of Bladen County.

All defendants are entitled to an impartial jury under both the United States and the North Carolina Constitutions. U.S. Const. Amends. V, VI, XIV; N.C. Const., Article I, §§ 19, 23, 24, and 35. *See also Irvin v. Dowd*, 366 U.S. 717, 6 L. Ed. 2d 751 (1961). A sheriff acting pursuant to N.C. Gen. Stat. § 9-11 has " '[a] right and duty to use his best judgment in securing men of intelligence, courage, and good moral character, but he must act with entire impartiality.' " *State v. White*, 6 N.C. App. 425, 428, 169 S.E.2d 895, 897 (1969) (quoting 50 C.J.S., Juries, § 186 p. 921)). A challenge to jury selection under N.C. Gen. Stat. § 9-11 is sustainable when " 'there is a partiality or misconduct in the sheriff, or some irregularity in making out the list.' " *State v. Dixon*, 215 N.C. 438, 440, 2 S.E.2d 371, 372 (1939) (quoting *State v. Speaks*, 94 N.C. 865, 873 (1886)).

Defendant maintains that the actions of the Bladen County Sheriff and his deputies were improper under N.C. Gen. Stat. § 9-11. When Bladen County Sheriff Bunn was asked how he found eligible jurors, he explained that

> [t]wo members of my senior staff and I sat down and just started a list of names of people that we knew that it wouldn't cause a financial hardship for and from various parts of the county, and we provided that list to them as potentials, you know, to check with these people and see if they are able to serve or not, and if they haven't served in the past two years, and so on, all the various qualifications of jurors.

> We gave them that list and said, you know, "Check with these people. If they're available, do them. If you can't find them and you see someone else that meets these criteria, then summons those also."

Defendant strongly urges this Court to find that the sheriff's practices pursuant to N.C. Gen. Stat. § 9-11 constitute prejudice *per se*. He argues that such prejudice manifested itself in several respects. First, the lead detective on the case, Detective Rodney Warwick, works for the Bladen County Sheriff; defendant maintains that this fact created an appearance of impropriety. Further, defendant points out that the Sheriff and the deputies who served the eleven summonses for additional jurors personally knew some of the potential jurors, again creating an appearance of impropriety. Defendant also raises concerns about the potential for abuse and argues that N.C. Gen. Stat. § 9-11 gives very little guidance about how sheriffs are to find potential jurors.

We do not find defendant's arguments persuasive. Our Supreme Court has stated that "[a] sheriff is not disqualified from summoning supplemental jurors because he or a member of the sheriff's office is testifying in the case." *State v. Barnard,* 346 N.C. 95, 102, 484 S.E.2d 382, 386 (1997). Absent proof that a sheriff "violated the discretionary trust placed in him [by N.C. Gen. Stat. § 9-11], he should remain free to use his best judgment in carrying out the orders of the court." *State v. White,* 6 N.C. App. 425, 428, 169 S.E.2d 895, 897 (1969). Furthermore, this Court has stated that

> [d]eputy sheriffs testify in many cases. We do not believe the leg-islature intended to disqualify sheriffs from summoning extra jurors in all of them. If this were so, we believe the legislature would have designated some other official to summon extra jurors.

*State v. Yancey,* 58 N.C. App. 52, 60, 293 S.E.2d 298, 303 (1982). While we agree with defendant that there is a possibility for abuse in the jury selection process, we also recognize the importance of giving a sheriff discretion so that he may carry out his duties pursuant to N.C. Gen. Stat. § 9-11. Our Court has stated that

> [n]owhere in the statute is there a provision delineating dis-cretionary restrictions to be placed on an officer in fulfilling the court's order. The statutory recognition that tales jurors may be needed and the statutory language used contemplates a system easily and expeditiously administered. To place procedural restrictions unnecessarily on their selection would defeat the purpose of the system, which is to facilitate the dispatch of the business of the court. Tales jurors are selected infrequently and only to provide a source from which to fill the unexpected needs of the court. They must still possess the statutory qualifica-tions and are still subject to the same challenges as are regular jurors and may be examined by both parties on *voir dire*. In order to retain the flexibility needed in the administration of such a system, the summoning official must be permitted some discretion, whether he be located in a relatively small community or a more heavily populated area, and to restrict the discretion placed in the summoning official, without proven cause, is to pre-sume he is not worthy of the office he holds. Such should not be the case.

*White,* 6 N.C. App. at 428, 169 S.E.2d at 897. *See also State v. Shaw,* 284 N.C. 366, 369, 200 S.E.2d 585, 587 (1973).

The trial court made detailed findings of fact and conclusions of law before denying defendant's motions. We will not disturb the actions of the trial court on appeal unless there was an abuse of discretion. "[T]he scope of appellate review . . . is strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law." *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982). The eleven supplemental jurors were called to serve only as alternate jurors; alternate jurors are not members of the jury until one of the jurors dies or is discharged and the trial court substitutes the alternate in his place. *See State v. Bindyke*, 288 N.C. 608, 622-23, 220 S.E.2d 521, 530 (1975). Defendant's objection became moot when none of the supplemental jurors were seated as alternate jurors for defendant's trial. All eleven supplemental jurors were excused, and the two alternate jurors ultimately were selected from the original jury pool. Since the jurors who ultimately sat for defendant's trial were chosen in the ordinary course, there was no error. Even if jurors selected under N.C. Gen. Stat. § 9-11 ultimately had been seated for defendant's trial, we find that the statute is constitutional on its face. We expressly decline to adopt defendant's prejudice *per se* argument, and overrule this assignment of error.

### The Trigger Pull Test

[3] Defendant next maintains that the trial court erred in admitting the State's evidence of a trigger pull test conducted on the murder weapon by a firearms expert. At trial, S.B.I. Agent Tom Trochum was qualified as an expert in toolmark and firearm identification. Agent Trochum is trained to compare toolmarks and to determine from what weapon certain rounds of ammunition were fired. Agent Trochum testified that the murder weapon was the same one that defendant had thrown from the truck window before he was arrested. The State then asked Agent Trochum about the results of trigger pull tests conducted on the murder weapon. Such tests determine the amount of pressure needed to discharge a gun in both single action and double action mode. This information in turn helps determine whether a gun could accidentally misfire, or if the person handling the gun had to actually go through the motions of firing before the gun could go off.

When the State began questioning Agent Trochum about the results of the trigger pull tests, defendant objected, stating he was not

STATE v. NOLEN

[144 N.C. App. 172 (2001)]

notified Agent Trochum would testify about trigger pull tests. Defendant further asserted that the State's disclosure document indicated that Agent Trochum would only testify about toolmark identification and firearms identification. The trial court heard arguments from both attorneys as follows:

> **MR. POPE** [Defendant's Attorney]: I have a copy of his report, but it doesn't indicate any testing or results of any trigger pull. We object to testimony regarding that.

> **MR. BOLLINGER** [Prosecutor]: He's had notes that the witness was going to testify, he's had access to talk to him. It's a test they always perform and they never put in their reports.

> **MR. POPE** [Defendant's Attorney]: We got results of an examination; doesn't mention anything about such tests.

> **THE COURT**: Well, I'll permit him to testify. I'll note your exception.

Defendant contends this testimony shows that the prosecutor knew that the trigger pull tests were routinely done, and failed to make it clear to defendant that those results were routinely left out of the reports. Defendant argues that such behavior is misleading and constitutes a violation of statutory discovery requirements.

Defendant states that none of the State's five "Discovery Disclosure Certificates" mentioned the trigger pull tests. The Discovery Disclosure Certificates signed by the prosecutor

> certif[ied] that [the prosecutor] provided discovery in the following manner to the defendant of matters required under N.C.G.S. 15A-903 et. seq:

> A. By providing the attorney for the defendant with a copy of the State's investigative file, reports of evidence examinations and the criminal history of the Defendant as received by this office.

While defendant is correct that the prosecutor has both an ethical and a statutory duty to disclose information, we do not find that the prosecutor breached those duties here. The trial court found that the trigger pull test was "just standard procedure to see that the gun is operating properly." Agent Trochum's report was made available to defendant by the prosecutor. Though the report did not contain the

trigger pull information, the prosecutor fulfilled his duty by providing defendant with a copy of that report in its entirety.

Even if the prosecutor's actions constituted a discovery violation, the trial judge still retained broad discretion to determine if sanctions were appropriate under N.C. Gen. Stat. § 15A-910 (1999). Unless the trial court abused that discretion, the decision will not be reversed. "The choice of which sanction, *if any*, to impose is left to the sound discretion of the trial court. A trial court will not be reversed on appeal absent a showing that its ruling was so arbitrary that it could not have been the result of a reasoned decision." *State v. Banks*, 322 N.C. 753, 761, 370 S.E.2d 398, 404 (1988) (citation omitted). Additionally, "discretionary rulings of the trial court will not be disturbed on the issue of failure to make discovery absent a showing of bad faith by the state in its noncompliance with the discovery requirements." *State v. McClintick*, 315 N.C. 649, 662, 340 S.E.2d 41, 49 (1986).

The State correctly points out that defendant never made a motion under N.C. Gen. Stat. § 15A-903(e) for discovery of test results; instead, defendant relied on the State's "open file" discovery policy. Defendant knew that Agent Trochum examined the murder weapon, prepared a report and was scheduled to testify at trial. Defendant had ample opportunity to examine the report and inquire as to whether any trigger pull tests were conducted.

Moreover, the trial court's ruling was not arbitrary. The trial court noted that the trigger pull test was a routine part of the firearms testing procedure for any weapon undergoing ballistics study. Indeed, defendant's own firearms expert, Mr. Forrest Bell, indicated that trigger pull tests were routinely done whenever a gun was cleaned and inspected. Keeping in mind that the purpose of discovery under N.C. Gen. Stat. § 15A-903 is to avoid unfair surprise at trial, we find there was no unfair surprise or bad faith on the part of the State. The trial court's ruling was not arbitrary, and defendant's assignment of error is overruled.

## Defendant's Appearance on the Night of the Crimes

[4] Defendant next argues that the trial court erred in sustaining the State's objections to questions eliciting information about whether defendant appeared drunk and irrational on 24 July 1998, because the effect was to deprive him of " 'a meaningful opportunity to present a complete defense.' " *Crane v. Kentucky*, 476 U.S. 683,

690, 90 L. Ed. 2d 636, 645 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485, 81 L. Ed. 2d 413, 419 (1984)). During the trial, defendant maintained that he was too incapacitated by drugs and alcohol to form the requisite criminal intent to commit the crimes of robbery and first-degree murder. Defendant and two medical witnesses testified to that effect, explaining that defendant was in an alcohol and drug induced blackout when the crimes were committed. Despite this testimony, defendant sought further corroboration of the alcohol and drug induced blackout by asking the questions that the State objected to. Defendant's eyewitness, David Wilkins, was unavailable because he asserted his Fifth Amendment privilege. Defendant contends that the State's sustained objections caused him to lose three other corroborating witnesses as well.

We find that defendant successfully elicited testimony from other witnesses who saw him consume drugs and alcohol throughout the day, prior to the commission of the crimes. Even before the State's objections were sustained, defendant presented evidence that corroborated his testimony about his substance abuse. "[T]he scope of cross examination rests largely within the discretion of the trial court. Absent a showing of an abuse of discretion or that prejudicial error has resulted, the trial court's ruling will not be disturbed on review." *State v. Maynard*, 311 N.C. 1, 10, 316 S.E.2d 197, 202-03, *cert. denied*, 469 U.S. 963, 83 L. Ed. 2d 299 (1984), *cert. denied*, 502 U.S. 1110, 117 L. Ed. 2d 450 (1992); and *State v. Sams*, 317 N.C. 230, 240, 345 S.E.2d 179, 185 (1986).

The State objected to the form of defendant's questions because they called for speculation by the individual witnesses as to defendant's state of mind. *See State v. Richmond*, 23 N.C. App. 683, 685, 209 S.E.2d 535, 536 (1974) (explaining that "[w]hile a cross-examiner has wide latitude in his examination, the court does have discretion to limit argumentative questioning—particularly about matters of which the witness can have only a speculative opinion"). Defendant, not the other witnesses, provided the best evidence as to his state of mind on 24 July 1998. Defendant cannot show that the trial court's rulings affected the outcome of the trial; therefore, this assignment of error is overruled.

**The Short-Form Murder Indictment—N.C. Gen. Stat. § 15-144**

[5] Finally, defendant argues that the trial court erred in entering judgment against him using the short-form murder indictment authorized by N.C. Gen. Stat. § 15-144 (1999) because the short-form indict-

ment violates the constitutional requirements of first charging the elements of the offense in the indictment, submitting them to the jury, and then making the State prove the elements beyond a reasonable doubt. *See Jones v. United States*, 526 U.S. 227, 232, 143 L. Ed. 2d 311, 319 (1999). Defendant contends that the short-form indictment is constitutionally defective in three ways: (1) the indictment does not allege any of the elements of first-degree murder that distinguish it from second-degree murder; (2) the indictment does not indicate the theory of first-degree murder the grand jury found based on the evidence; and (3) the indictment violates the Equal Protection Clause of the Fourteenth Amendment because it fails to give defendant notice of the elements of the charge against him. Defendant also urges us to examine the short-form indictment using a strict scrutiny analysis because this is a fundamental right. We disagree with defendant's characterization of the short-form indictment, and find it constitutionally sound.

The indictment charged that defendant "unlawfully, willfully and feloniously did of malice aforethought kill and murder Dorothy Jordan" in violation of N.C. Gen. Stat. § 14-17 (1999). Defendant's constitutional arguments were expressly rejected in *State v. Wallace*, 351 N.C. 481, 504-08, 528 S.E.2d 326, 341-43, *cert. denied*, 531 U.S. 1018, 148 L. Ed. 2d 498 (2000), *reh'g denied*, 531 U.S. 1120, 148 L. Ed. 2d 784 (2001); and *State v. Braxton*, 352 N.C. 158, 173-75, 531 S.E.2d 428, 436-38 (2000), *cert. denied*, 531 U.S. 1130, 148 L. Ed. 2d 797 (2001). As we are bound by the decisions of the Supreme Court, we overrule this assignment of error.

We therefore find that defendant received a fair trial, free of prejudicial error. In that trial, we find

No error.

Judges WALKER and THOMAS concur.